William P. FORD, for and on behalf of the ESTATE OF Ita C. FORD, Julia Clark Keogh, for and on behalf of the Estate of Mary Elizabeth Clarke, a.k.a. Maura Clarke, et al., Plaintiffs–Appellants,

v.

Jose Guillermo GARCIA, an individual, Carlos Eugenio Vides–Casanova, an individual, Defendants–Appellees.

No. 01–10357.

United States Court of Appeals, Eleventh Circuit.

April 30, 2002.

Peter Charles Choharis, Mayer, Brown & Platt, Washington, DC, for Plaintiffs–Appellants.

Kurt R. Klaus, Jr., Miami, FL, for Defendants–Appellees.

Before CARNES, BARKETT and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

The main issue presented in this appeal, one of first impression in the federal courts, is the allocation of the burden of proof in a civil action involving the command responsibility doctrine brought under the Torture Victim Protection Act. This appeal also presents the issue of

whether the district court committed reversible error in allowing a defense witness to testify as an expert where Defendants–Appellees did not comply with all of the local rules regarding expert witnesses.

## I. Background

Three nuns and one layperson (the "churchwomen"), all Americans engaged in missionary and relief work in El Salvador, were abducted, tortured, and murdered in December 1980 by five members of the Salvadoran National Guard (the "Guardsmen"). Approximately three years later, in response to American pressure to punish the responsible parties, the Guardsmen were convicted of the crimes and sentenced to prison terms. In the period before and after this tragic incident, thousands of civilians in El Salvador were victimized by violence during a civil war in which both communist and colonialist forces competed with the government for control of the country. At the time of the murders and directly before, Defendant General Carlos Eugenio Vides Casanova was Director of the Salvadoran National Guard and Defendant General Jose Guillermo Garcia was El Salvador's Minister of Defense. Both defendants currently reside in Florida.

 Subsequent to the murders of the churchwomen, Congress passed the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102–256, 106 Stat. 73 at Historical and Statutory Notes to 28 U.S.C.A. § 1350.[1] The TVPA allows victims of violations of international law, or those victims' representatives, to bring a civil cause of action in federal district court against commanders under the international law doctrine of command responsibility.[2] This doctrine makes a commander liable for acts of his subordinates, even where the commander did not order those acts, when certain elements are met. Relying on the TVPA, Plaintiffs–Appellants, for and on behalf of the estates of the churchwomen, filed suit against Defendants–Appellees in 1999 seeking to recover damages for the torture and murders. Appellants invoked the doctrine of command responsibility and alleged that the executions at issue were part of a pattern and practice of extrajudicial killings committed by the Salvadoran National Guard under Appellees' command.

At trial, Appellants offered evidence of the great number of atrocities committed against civilians at the hands of the Salvadoran military in the months preceding the churchwomen's deaths. The Generals conceded that they were aware of a pattern of human rights abuses in El Salvador during their tenures as Minister of Defense and Director of the National Guard, but argued that they did not have the ability to control their troops during this period. As part of their defense, Appellees called Edwin

---

**1.** "An individual who ... (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." 28 U.S.C.A. § 1350, note § 1(a), Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73.

**2.** "However, a higher official need not have personally performed or ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them."
S. Rep. No. 102–249, at 9 (1991).

Corr, U.S. Ambassador to El Salvador from 1985 to 1988, to testify as both a fact and expert witness. After deliberations, the jury returned a verdict for Appellees. Appellants argue on appeal that the jury instructions given at trial contained material misstatements of law and that Ambassador Corr's testimony was erroneously admitted because they had no pretrial notice of Appellees' intent to call Corr as an expert and received no expert report.

## II. Discussion

### A. The Jury Instructions

Appellants contend that the jury instructions in this case contained errors of law which placed on them the burden of establishing elements that they are not required to prove under either the TVPA or the international law which the TVPA has adopted. The instructions required Appel-

lants to prove by a preponderance of the evidence first that the Guardsmen were under Appellees' "effective command," defined as the legal authority and the practical ability of the Generals to control the guilty troops, and second, that the Generals failed to take all reasonable steps to prevent or repress the murders of the churchwomen.[3] Appellants argue that both of these showings are properly affirmative defenses that the Appellees had the burden of proving at trial. Finally, Appellants contend that the district court's instructions erroneously included proximate cause as a required element before liability could be established under the TVPA and command responsibility doctrine.[4]

### 1. The Command Responsibility Instruction

■ Federal Rule of Civil Procedure 51 provides that "[n]o party may assign as

---

3. The district court's jury instruction under the heading "Command Responsibility" read, in relevant part, as follows:

To hold a specific defendant/commander liable under the doctrine of command responsibility, each plaintiff must prove all of the following elements by a preponderance of the evidence:

(1) That persons under defendant's effective command had committed, were committing, or were about to commit torture and extrajudicial killing; and

(2) That defendant knew, or owing to the circumstances at the time, should have known, that persons under his effective command had committed, were committing, or were about to commit torture and extrajudicial killing; and

(3) The defendant failed to take all necessary and reasonable measures within his power to prevent or repress the commission of torture and extrajudicial killing or failed to investigate the events in an effort to punish the perpetrators.

"Effective command" means the commander has the legal authority and the practical ability to exert control over his troops. A commander cannot, however, be excused from his duties where his own actions cause or significantly contribute to the lack of effective control.

4. The district court's jury instruction under the heading "Proximate Cause and Command Responsibility" read, in whole, as follows:

The plaintiffs may recover only those damages arising from those omissions that can be attributed to the defendant. Each plaintiff must therefore prove that the compensation he/she seeks relates to damages that naturally flow from the injuries proved. In other words, there must be a sufficient causal connection between an omission of the defendant and any damage sustained by a plaintiff. This requirement is referred to as "proximate cause."

As I have told you, international law and the law of the United States impose an affirmative duty on military commanders to take appropriate measures within their power to control troops under their command to prevent torture and extrajudicial killing.

If you find that one or more of the plaintiffs have established all of the elements of the doctrine of command responsibility, as defined in these instructions, then you must determine whether the plaintiffs have also established by a preponderance of the evidence that the church women's injuries were a direct or a reasonably foreseeable consequence of one or both defendants' fail-

error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. Pro. 51. This rule exists "to prevent unnecessary new trials because of errors the judge might have corrected if they had been brought to his attention at the proper time." *Pate v. Seaboard R.R.*, 819 F.2d 1074, 1082 (11th Cir.1987) (quoting *Industrial Dev. Bd. v. Fuqua Indus.*, 523 F.2d 1226, 1238 (5th Cir.1975)); *see also Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir.1999).

 This court, however, has recognized an exception to the general requirements of Rule 51 where the district court commits error "so fundamental as to result in a miscarriage of justice" if relief is not granted. *Iervolino v. Delta Air Lines, Inc.*, 796 F.2d 1408, 1414 (11th Cir.1986). Under this standard of review, generally referred to as plain error, an appellant must establish that: (1) an error occurred;

(2) the error was plain; (3) it affected substantial rights; and (4) it seriously affected the fairness of the judicial proceedings. *United States v. Humphrey*, 164 F.3d 585, 588 n. 3 (11th Cir.1999). Therefore, if no objection to the challenged instruction was raised at trial, we only review for plain error. *United States v. Smith*, 231 F.3d 800, 807 (11th Cir.2000). Because Appellants failed to object to the command responsibility instruction at trial, we review for plain error.[5]

 The essential elements of liability under the command responsibility doctrine are: (1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes. Although the TVPA does

---

ure to fulfill their obligations under the doctrine of command responsibility.

Keep in mind that a legal cause need not always be the nearest cause either in time or in space. In addition, in a case such as this, there may be more than one cause of an injury or damages. Many factors or the conduct of two or more people may operate at the same time, either independently or together, to cause an injury.

5. Although it does not affect the result, we do note that after the district court proposed a definition of "effective command" as the "legal authority and practical ability to exert control" over troops, Appellants suggested that a sentence be included with this definition to the effect that a commander cannot defend himself on the basis of ineffective command that he was in part responsible for creating. As the district court stated:

"[The instruction] now reads 'effective command means the commander'—it says has,

I wonder if it should be had, '... the legal authority and the practical ability to exert control over his troops.' The plaintiff suggested that and another sentence be added to it, and the sentence reads, 'A commander cannot, however, be excused from his duties where his own actions cause or significantly contribute to the lack of effective control.' "

*See also* Plaintiffs' Requested Amendments to Proposed Jury Instructions, 10/31/00. The jury instruction eventually given included this exact language suggested by Appellants. Similarly, Appellants specifically proposed that they must prove by a preponderance of the evidence that each defendant "failed to take all necessary and reasonable measures within his power to prevent the commission of torture and extrajudicial killings...." Plaintiffs' Proposed Jury Instructions on Command Responsibility, 10/27/00.

not explicitly provide for liability of commanders for human rights violations of their troops, legislative history makes clear that Congress intended to adopt the doctrine of command responsibility from international law as part of the Act.[6] Specifically identified in the Senate report is *In re Yamashita,* 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946), a World War II era case involving the command responsibility doctrine in habeas review of the conviction of a Japanese commander in the Philippines by an American military tribunal. *See* S. Rep. No. 102–249, at 9 (1991). Describing *Yamashita's* holding, the Senate Report stated that the Supreme Court found a foreign general "responsible for a pervasive pattern of war crimes (1) committed by his officers when (2) he knew or should have known they were going on but (3) failed to prevent or punish them." *Id.* In the years since *Yamashita* and the passage of the TVPA, the International Criminal Tribunals for the Former Yugoslavia and Rwanda have been established, and their statutes contain language providing for imposition of command responsibility on substantively identical grounds to those enunciated in *Yamashita.*[7]

Appellants assert that once a plaintiff has proven these three prima facie elements by a preponderance of the evidence, the burden then shifts to the defendant to establish any affirmative defenses. In Appellants' view, possible affirmative defenses are that the commander did not have effective command over his troops, i.e. the practical ability to control them, or that he took all necessary and reasonable measures to prevent the abuses. Although never explicitly using these terms, Appellants seem to assume that this shift of burdens places both the burden of production, i.e., the burden of coming forward, *and* the burden of persuasion on the defendants with regard to these affirmative defenses. We understand their argument to be that the instructions challenged here misstated the law of command responsibility by misallocating the burden of persuasion on these matters. Put another way, Appellants accept that they bear the burden of showing (1) a superior-subordinate relationship between the commander and the perpetrators, (2) the requisite knowledge on the part of the commander, and (3) the commander's failure to prevent or repress the abuses or to punish the perpe-

---

6. *See supra* note 2.

The TVPA allows plaintiffs to bring civil actions against commanders, whereas much of the relevant authority on the command responsibility doctrine has arisen in the context of criminal proceedings before international tribunals. We find no indication from the legislative history, however, that when Congress adopted the doctrine from international law, it intended courts to draw any distinction in their application of command responsibility in the civil arena.

7. "The fact that any of the acts referred to in article 2 to 5 of the present Statute was committed by a subordinate does not relieve his superior of criminal responsibility if he knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to

take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof."
Art. 7(3), Statute of the International Criminal Tribunal for Former Yugoslavia (ICTY) (May 25, 1993).

"The fact that any of the acts referred to in articles 2 to 4 of the present Statute was committed by a subordinate does not relieve his or her superior of criminal responsibility if he or she knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof."
Art. 6(3), Statute of the International Criminal Tribunal for Rwanda (ICTR) (Nov. 8, 1994).

trators; they deny, however, that the requirements for proving these three elements are as onerous as the district court explained to the jury. They contend that contrary to the command responsibility instruction given, it is for the defendants to come forward with evidence sufficient to prove that they did not have the practical ability to control their troops or that they took all necessary and reasonable measures to control the troops, either one of which would serve to exonerate them from liability.

■ Appellants urge that their position that Defendants were required to show their lack of practical ability to control the guilty troops as part of an affirmative defense finds support in the Supreme Court's *In re Yamashita* decision. There the Supreme Court upheld on habeas review the military tribunal's authority to try General Yamashita, as well as its findings and jury instructions. *In re Yamashita*, 327 U.S. at 17, 25, 66 S.Ct. 340. Appellants read the decision as allocating the burden of persuasion to be applied for each issue in future command responsibility cases to whichever party raised that issue in front of the original *Yamashita* tribunal. Appellants maintain that at the military tribunal Yamashita attempted to show his lack of effective control over his troops, and insist that he would not have made this effort had he not carried the burden of persuasion on this matter.

Despite Appellants' assertions that the district court's definition of "effective command" misplaced the burden of persuasion, we find no plain error. *In re Yamashita* did not explicitly address the allocation of the burdens on the elements of command

responsibility. Nor is there any indication that the Court there ever considered how to allocate the burdens of production or persuasion in future command responsibility trials. Further, Appellants' contention that Yamashita's raising his lack of effective control before the American military tribunal necessarily implies that he carried the burden of persuasion on that issue is flawed. Yamashita might have raised his lack of effective control because he had the burden of production on the issue, although not the burden of persuasion. Alternatively, he may have believed that his most effective defense lay in pointing out facts that, if believed by the trier of fact, would establish that the prosecution could not carry out its burden of proving the elements of command responsibility.

The recently constituted international tribunals of Rwanda and the former Yugoslavia have applied the doctrine of command responsibility since *In re Yamashita*, and therefore their cases provide insight into how the doctrine should be applied in TVPA cases. Recent international cases consistently have found that effective control of a commander over his troops is required before liability will be imposed under the command responsibility doctrine. The consensus is that "[t]he concept of effective *control* over a subordinate in the sense of a material ability to prevent or punish criminal conduct, however that control is exercised is the threshold to be reached in establishing a superior-subordinate relationship...." *Prosecutor v. Delalic* (Appeals Chamber ICTY, Feb. 20, 2001) ¶ 256;[8] *accord id.* at ¶ 266; *Prosecutor v. Aleksovski*, Judgment (Appeals Chamber

---

8. Although the decision of the Appeals Chamber in *Prosecutor v. Delalic* was handed down after the challenged jury instructions were

given, the opinion in that case only reiterated what numerous other international tribunals had already decided on the issue prior to

ICTY, March 24, 2000) ¶ 76; *Prosecutor v. Blaskic*, Judgment (Trial Chamber ICTY, March 3, 2000) ¶¶ 295, 302 ("Proof is required that the superior has effective control over the persons committing the violations of international humanitarian law in question, that is, has the material ability to prevent the crimes and to punish the perpetrators thereof."); *Prosecutor v. Kayishema*, Judgment (Trial Chamber ICTR, May 21, 1999) ¶ 229 (stating that the "material ability to control the actions of subordinates is the touchstone of individual responsibility under Article 6(3)"); *Prosecutor v. Delalic*, Judgment (Trial Chamber ICTY, Nov. 16, 1998) ¶¶ 377, 378; *Prosecutor v. Akayesu*, Judgment (Trial Chamber ICTR, Sept. 2, 1998) ¶ 491. Many of these cases dealt with the situation converse to the one presented here, i.e., where a superior without *de jure* command was accused of having *de facto* control over the guilty troops. These cases emphasize, nonetheless, that the command responsibility theory of liability is premised on the actual ability of a superior to control his troops. A reading of the cases suggests that a showing of the defendant's actual ability to control the guilty troops is required as part of the plaintiff's burden under the superior-subordinate prong of command responsibility, whether the plaintiff attempts to assert liability under a theory of *de facto* or *de jure* authority. *Prosecutor v. Delalic* (Appeals Chamber ICTY, Feb. 20, 2001) ¶ 196 ("Effective control has been accepted, including in the jurisprudence of the Tribunal, as a standard for the

purposes of determining superior responsibility. . . . The showing of effective control is required in cases involving both *de jure* and *de facto* superiors."). Explaining the difference in application of this requirement in *de jure* and *de facto* cases, the same tribunal announced, "In general, the possession of *de jure* power in itself may not suffice for the finding of command responsibility if it does not manifest in effective control, although a court may presume that possession of such power *prima facie* results in effective control unless proof to the contrary is produced." *Id.* at ¶ 197.

Notably, the tribunal said that *de jure* authority over the guilty troops results in only a *presumption* of effective control. In other contexts, this court has held that a presumption shifts the burden of production with respect to the element it concerns, but not the burden of persuasion. *See Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir.1998) (distinguishing between "presumptions" and "inferences"); *see also* Fed.R.Evid. 301 (noting that presumptions create a burden of production for the party against whom the presumption is directed, but do not shift the ultimate burden of persuasion). Put another way, *Delalic* indicates that *de jure* authority of a commander over the troops who perpetrated the underlying crime is *prima facie* evidence of effective control, which accordingly can be rebutted only by the defense putting forth evidence to the finder of fact that the defendant lacked this effective control. *See* Black's Law Dictionary (7th ed. 1999) 579 (defining

---

these instructions. *See e.g., Prosecutor v. Aleksovski*, Judgment (Appeals Chamber, ICTY March 24, 2000) ¶ 76; *Prosecutor v. Blaskic*, Judgment (Trial Chamber ICTY, March 3, 2000) ¶¶ 295, 302; *Prosecutor v. Kayishema*, Judgment (Trial Chamber ICTR, May 21,

1999) ¶ 229; *Prosecutor v. Delalic*, Judgment (Trial Chamber ICTY, Nov. 16, 1998) ¶¶ 377, 378; *Prosecutor v. Akayesu*, Judgment (Trial Chamber ICTR, Sept. 2, 1998) ¶ 491. We quote from *Delalic* because it states the matter with great clarity.

*prima facie* evidence as "[e]vidence that will establish a fact or sustain a judgment unless contrary evidence is produced"). Thus, although we do not decide the issue, we note that nowhere in any international tribunal decision have we found any indication that the ultimate burden of *persuasion* shifts on this issue when the prosecutor—or in TVPA cases, the plaintiff shows that the defendant possessed *de jure* power over the guilty troops.

To the contrary, *Delalic* provides a strong suggestion that it is the plaintiff who must establish, in all command responsibility cases, that the defendant had effective control over his troops. That a *de jure* commander bears the burden of production on this issue does not affect the ultimate jury instruction that should be given. We previously have held that jury instructions are to address the ultimate burden of persuasion only, and should not needlessly confuse the jurors with which party held the burden of production at trial. *See Dudley v. Wal–Mart Stores, Inc.,* 166 F.3d 1317, 1321–22 (11th Cir. 1999) (noting that "[a]lthough statements like 'prima facie case' and 'burden of production' faithfully endeavor to track [the law], they create a distinct risk of confusing the jury") (quoting *Cabrera v. Jakabovitz,* 24 F.3d 372, 381 (2d Cir.1994)). This reasoning recognizes that "the distinction between burden of persuasion and burden of production is not familiar to jurors, and they may easily be misled by hearing the word 'burden' (though referring to a burden of production) used with reference to a defendant in an explanation of that part of the charge that concerns a plaintiff's burden of persuasion." *Id.* (quoting *Cabrera,* 24 F.3d at 381).

In the end, then, there is ample authority contrary to Appellants' argument that

Defendants bore the burden of persuasion on effective control. Decisions by the Yugoslav and Rwanda tribunals seem to allocate the burden of persuasion to plaintiffs on the issue of defendants' effective control. Even were we to read these cases in the light most favorable to Appellants, however, the decisions at least suggest that the burden of persuasion on this matter is not altogether certain. We therefore hold that there was no plain error here because the district court's instruction included an element which properly must be proved in command responsibility cases, and no case law exists clearly assigning the burden of persuasion away from the plaintiff on this matter. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding that a district court cannot commit plain error in giving a jury instruction where the contours of the law on which it is instructing are "in a state of evolving definition and uncertainty"); *Osterneck v. E.T. Barwick Indus.,* 825 F.2d 1521, 1533 (11th Cir.1987) (citing *Newport,* 453 U.S. at 256, 101 S.Ct. 2748, for the proposition that jury instructions cannot constitute plain error where the law charged was "uncertain and evolving").

 With regard to the "necessary and reasonable measures" portion of the district court's instruction, which the court included as part of Appellant's necessary showing in establishing the third prong of command responsibility, the governing statutes of both the Rwanda and former Yugoslavia international tribunals use the precise language employed here. *See* Art. 6(3), Statute of the ICTR (Nov. 8, 1994); Art. 7(3), Statute of the ICTY (May 25, 1993). Despite Appellants' claim that the defendant ordinarily bears the burden of persuasion on this element, we have found

no international tribunal decision that has addressed this issue. Rather, by not explicitly identifying who possesses the burden on this element, there seems to be a tacit assumption in the tribunal cases that the prosecutor whose burden replicates the burden of the plaintiff in TVPA command responsibility cases carries the burden to prove that the defendant failed to take necessary and reasonable measures to prevent the crime or punish the guilty troops. *See e.g., Prosecutor v. Blaskic,* Judgment (Trial Chamber ICTY, March 3, 2000) ¶ 294 ("[P]roof is required that: ... the accused failed to take the necessary and reasonable measures to prevent the crime or punish the perpetrator thereof."). Either way, as with the issue of effective control, we find no plain error where the district court's instruction mirrored the language of the most recent indicia of customary international law on this point, and where no clear case law exists allocating the burden of persuasion to the defendant on whether he took all necessary and reasonable measures to control his troops.

Although case law from recent international tribunals is sufficient to convince us that no plain error occurred here in the giving of the command responsibility instruction, we observe that the statute of the recently ratified International Criminal Court, commonly referred to as the Rome Statute, supports our holding on this matter as well.[9] As the statute addresses the command responsibility doctrine, it provides relevant authority for the required elements in TVPA cases invoking the doctrine. Article 28 of the Rome Statute, in relevant part, reads:

A military commander or person effectively acting as a military commander shall be criminally responsible for crimes within the jurisdiction of the Court committed by forces under his or her *effective command and control,* or effective authority and control as the case may be, as a result of his or her failure to exercise control properly over such forces, where: (i) That military commander either knew or, owing to the circumstances at the time, should have known that the forces were committing or about to commit such crimes; and (ii) That military commander or person *failed to take all necessary and reasonable measures* to prevent or repress their commission or to submit the matter to the competent authorities for investigation and prosecution.

Art. 28(a), Rome Statute of the International Criminal Court (July 17, 1998) (emphasis added). This language reinforces our holding that there was no plain error in either challenged portion of the command responsibility jury instruction.

### 2. The Proximate Cause Instruction

Appellants also argue that the proximate cause instruction given by the district court constitutes plain error, insisting that proximate cause is irrelevant under the doctrine of command responsibility. For support, they note that no international case has ever required such a showing for liability and that the Ninth Circuit has specifically rejected the argument that proximate cause is a required element of the doctrine. *See Hilao v. Estate of Marcos,* 103 F.3d 767, 774 (9th Cir.1996).

 "It is a cardinal rule of appellate review that a party may not challenge as

---

9. Sixty countries were required to ratify the creation of the International Criminal Court as an authoritative international legal body.

The Court was ratified by the requisite 60 countries on April 11, 2002, and its jurisdiction will begin July 1, 2002.

error a ruling or other trial proceeding invited by that party." *United States v. Ross*, 131 F.3d 970, 988 (11th Cir.1997) (quoting *Crockett v. Uniroyal, Inc.*, 772 F.2d 1524, 1530 n. 4 (11th Cir.1985)). Where invited error exists, it precludes a court from "invoking the plain error rule and reversing." *United States v. Davis*, 443 F.2d 560, 564–65 (5th Cir.1971).[10] This court has held that where a party, rather than just remaining silent and not objecting to a proposed jury instruction, responds to the court's proposal with the words "the instruction is acceptable to us," this constitutes invited error. *United States v. Fulford*, 267 F.3d 1241, 1247 (11th Cir.2001). In *Fulford*, we decided that these words served to waive a party's right to challenge the accepted instruction on appeal. *See id.*

 In this case, the record reveals that Appellants responded to the district court's proposed jury instructions with its own changes to the proximate cause section.[11] Where, as here, the instruction eventually given to the jury reflected changes that Appellants themselves pro-

posed and to which they did not later object, we may find under *Fulford* that they have waived any assertion of error on appeal. Furthermore, at one point during a discussion between the district court and counsel, the court recited its understanding of the proximate cause requirement to which Appellants' counsel responded in agreement.[12]

Accordingly, whatever light international law might shed on proximate cause as it pertains to the command responsibility doctrine, we have no trouble concluding that the challenged instruction constituted invited error and decline to review for reversible error.

**B. *Ambassador Corr's Expert Testimony***

Appellants argue that Appellees violated Local Rules 16.1 and 26.1 of the district court by failing to provide both adequate notice of Ambassador Corr's status as an expert and an expert report summarizing his testimony.[13] They did not depose Corr, as was their right,[14] and maintain that, as a result, they were severely preju-

---

**10.** Decisions by the former Fifth Circuit issued before October 1, 1981 are binding as precedent in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**11.** Plaintiffs' counsel stated, "We took that out of this and made it one charge under proximate cause."

**12.** The exchange was as follows:

The Court: That the jury has a right to look at all of the evidence that has been presented, but that under the doctrine of proximate cause, the question is, is there a connection between, if you will, a violation of the doctrine of command responsibility and the injuries that were sustained here. Those are the only injuries for which compensation is being sought, not on any other injuries. But the jury can look at the totality of

the evidence, but on the totality of the evidence whether the Plaintiffs have established their claims.

Plaintiffs' Counsel: I am concerned that the jury understands that the totality of the evidence-let me think this thing through. I think what you said is exactly right.

**13.** "Where expert opinion evidence is to be offered at trial, summaries of the expert's anticipated testimony or written expert reports ... shall be exchanged by the parties no later than 90 days prior to the pretrial conference...." S.D.Fla.R. 16.1.K (1998).

**14.** "A party may depose any person who has been identified as an expert whose opinions may be presented at trial. The deposition shall not be conducted until after the expert summary or report required by Local Rule 16.1.K is provided." S.D.Fla.R. 26.1.F(1)(c) (1998).

diced by their inability to cross-examine Corr effectively. Corr testified about the Generals' alleged efforts to stop human rights abuses and the difficulty of controlling their troops while El Salvador was experiencing civil strife. Because Appellants insist that Appellees' pretrial disclosure designated Corr as a potential fact witness only,[15] they contend that the district court abused its discretion by failing to subject the defense to "appropriate penalties," as required by the Local Rules.[16] Appellants claim to have interpreted the witness list as identifying several matters on which Corr might testify for the period 1985–1988, based on his personal knowledge as the U.S. Ambassador during these years.

Initially, we comment that Appellants' claim not to have had any notice of Corr testifying as a possible expert witness is questionable. When Appellants received the defense's witness list eleven months before trial, listed under Corr's name, former position, and the dates he held that position were those matters as to which he might be called to testify; two of the six entries began with the word "opinion." This undoubtedly provided Appellants with some notice that Corr was being offered as a potential expert witness.[17] Additionally, the dates under Corr's name were printed directly across from the diplomatic position he held during those years, in the same format (in bold and underlined). Appellants thus could reasonably have inferred that those years referred only to the dates during which Corr was U.S. Ambassador to El Salvador, and not the dates about which he was to testify. Although Appellants argue that they had no reason to depose Corr based on the witness list because the time period about which he was designated to testify, 1985–1988, came four and one-half years after the murders of the churchwomen, this makes little sense; Appellees surely had no reason to

---

15. The witness list included the following:
 **Ambassador EDWIN G. CORR**
 **U.S. Ambassador to El Salvador 1985–1988**
 —Opinion about general situation in El Salvador: political, economic and military.
 —Opinion about General Vides Casanova, Minister of Defense.
 —Removing the Armed Forces from the political arena.
 —Promoting the respect for the rights of all citizens.
 —Prosecuting the counterinsurgency war in a continually professional manner.
 —Institutionalization of democracy in El Salvador.

16. "Failure to comply with the requirements of this rule will subject the party or counsel to appropriate penalties, including but not limited to dismissal of the cause, or the striking of defenses and entry of judgment." S.D.Fla.R. 16.1.M (1998).

17. We recognize that Federal Rule of Evidence 701 allows for opinion testimony by non-expert witnesses where the offered opinions are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See* Fed.R.Evid. 701. Ambassador Corr's "opinion about [the] general situation in El Salvador: political, economic, and military," however, would seem more naturally to fall under Rule 702, governing testimony by experts. *See* Fed.R.Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").

offer a fact witness who could testify based on personal knowledge only as to dates irrelevant to the case. This should have been another indication to Appellants that Corr was being offered as an expert. Moreover, the roster of witnesses offered by Appellees listed a number of other potential witnesses who had served in military or diplomatic positions, and listed their years of service in those positions directly across from their title in bold and underlined, exactly as was done for Ambassador Corr's entry.

 All this being said, it is nonetheless true that Appellees did not comply with the requirement of the Local Rules to provide Appellants with an expert report summarizing Corr's expected testimony. Appellants, however, never objected to Appellees' failure to comply. Instead, they objected to the scope of the Ambassador's testimony, explaining to the district court that they did not recognize Ambassador Corr as an expert in Salvadoran military and political affairs for the time periods about which he was called to testify.[18] Although Appellants claim that they made their grounds for objection clear when they stated at trial that Corr had not been deposed, this comment does not constitute an objection on the basis of their failure to receive an expert report with sufficient clarity. Moreover, when the district court overruled Appellants' objections on Corr's qualifications as an expert for the time period relevant to the case, Appellants did not move to exclude the Ambassador, nor did they request a continuance for an op-

portunity to prepare or depose the witness. They claim such a request would have been futile, as Ambassador Corr was only available to testify that same day. Possible futility of the request, however, does not relieve Appellants of their obligation to preserve error on those issues which they later seek to appeal.

 Where a party has the opportunity to object, but remains "silent or fails to state the grounds for objection, objections . . . will be waived for purposes of appeal, and this court will not entertain an appeal based upon such objections unless refusal to do so would result in manifest injustice." *United States v. Page*, 69 F.3d 482, 492–93 (11th Cir.1995). We hold that where the list provided to Appellants eleven months prior to trial indicated that the witness providing the challenged testimony was an expert; where the Appellants were able to offer their own experts; where Appellants did not make known to the district court their objections to Appellees' failure to comply with the Local Rule regarding expert reports; and where we read the Local Rule providing "appropriate penalties" for failure to comply with the expert report requirement as lodging discretion with the district court on this matter, no manifest injustice will result from our refusal to entertain this appeal.

## III. Conclusion

Based on the foregoing, we find no reversible error on the part of the district court.

AFFIRMED.

---

18. *The exchange went as follows:*
The Court: Do I assume, Mr. Klaus, that you are proffering the Ambassador as an expert in the area of El Salvador?
Defense Counsel: Yes, Your Honor.
The Court: All right. Any objection to that?

Plaintiffs' Counsel: We do not recognize him as an expert for this time period, Your Honor.
The Court: All right, I will overrule that objection.

BARKETT, Circuit Judge, concurring:

I concur in the majority's decision. As to the command responsibility instruction, Appellants simply argue that the trial judge should have instructed the jury on the doctrine's "shifting burdens of proof." This argument is unavailing, as the majority holds, both because there is no existing law as to the appropriate allocation of burdens under the command responsibility doctrine and because, under our precedent, the jury is not instructed as to a shifting burden of production. Thus, there was no plain error regarding the command responsibility instruction.

In addition, although Appellants complain that the court erroneously failed to instruct the jury that the Generals had the burden of "affirmatively" establishing that they lacked the ability to control the perpetrators, such an "affirmative" defense would be aimed at disproving the existence of a superior-subordinate relationship, a component of the command responsibility doctrine that was not a contested issue at trial. As the majority notes, demonstrating a commander's "effective control" over his subordinates is a component of proving the "superior-subordinate" relationship required under the first prong of the command responsibility doctrine. In this case, the Generals conceded that they were the commanders of, and had authority over, the troops who committed the crimes. The Generals' defense was not directed at the first prong regarding commander status, but rather at the third prong of the doctrine requiring a showing that the commanders failed to take all necessary and reasonable mea-

sures to prevent or punish the commission of torture or extrajudicial killing.[1] The Generals proffered their testimony, the testimony of Ambassador Corr, supporting documentary evidence concerning the general state of affairs in El Salvador at the time of the murders, and the fact that the troops responsible for the murder were tried and convicted to rebut the existence of the third prong by demonstrating that the Generals had attempted to prevent, repress, and punish human rights violations. Given the fact that the Generals admitted their superior status in the command hierarchy, the Appellants' argument regarding "effective control" as it relates to the first prong is misplaced, as it addresses a subject not at issue in this case. Thus, for this additional reason, I do not believe the Appellants' argument in this regard has merit.

I also note that, although not at issue in this case, the district court's definition of "effective command" does not precisely state the law with respect to officials deemed to hold *de facto* but not *de jure* authority. The court defined an official with "effective command" as one possessing both "the legal authority and the practical ability to exert control over his troops." This "effective command" instruction is accurate insofar as it requires officials with *de jure* authority also to exercise "effective control." The instruction does not accurately reflect the standard for *de facto* officials, however, because those officials can be held responsible without a showing of legal authority. A *de facto* superior is an official who exercises "powers of control over subordinates" that are "substantially similar" to those exer-

---

1. The evidence required to prove the first and third prongs is somewhat related, as the first prong requires demonstrating that the commander had the authority or *could* prevent or punish the crimes and the third prong requires demonstrating that the commander *failed* to take all necessary and reasonable measures to prevent or punish the crimes.

cised by *de jure* authorities. *Prosecutor v. Delalic*, ¶ 197 (Appeals Chamber ICTY, Feb. 20, 2001). As the majority clearly establishes, current international law provides that an official without legal authority may be held responsible for others' violations of international law where that official exercised a degree of control sufficient to confer *de facto* authority.

As to the proximate cause instruction, I agree with the majority's resolution of that issue because I believe a fair reading of our Circuit precedent holds that if error is invited, we may not review the error even if it is harmful. *See, e.g., United States v. Fulford*, 267 F.3d 1241, 1247 (11th Cir. 2001); *United States v. Ross*, 131 F.3d 970, 988 (11th Cir.1997). However, I believe we should reconsider that precedent and agree with the Sixth and Ninth Circuits, which have held that invited error may result in reversal in certain "exceptional situations."[2] *See, e.g., United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir.1993); *United States v. Ahmad*, 974 F.2d 1163, 1165 (9th Cir.1992) ("An invited error is only cause for reversal in the 'exceptional situation' in which it is 'necessary to preserve the integrity of the judicial process or prevent a miscarriage of justice.'") (internal citations omitted); *United States v. Schaff*, 948 F.2d 501, 506 (9th Cir.1991). In my opinion, one of these "exceptional situations" arises where there is no evidence that a party has "invited" error in bad faith and where substantial injustice is the result of that error. This case presents such a situation. There was no bad faith alleged on the part of the Appellants, the instruction requiring proof of proximate cause was legally erroneous, and the record reflects that the error had a clear impact on the jury's determination. In my judgment, the proximate cause instruction calls into question the "integrity of the judicial process," thereby warranting reversal.

First, the instruction was erroneous because the concept of proximate cause is not relevant to the assignment of liability under the command responsibility doctrine. The doctrine does not require a *direct* causal link between a plaintiff victim's injuries and the acts or omissions of a commander. Once a plaintiff establishes a *prima facie* case by proving the doctrine's three prongs, the command responsibility doctrine requires no further showing to assign liability unless the commander presents a defense. In describing the scope of liability under the TVPA, the Senate Report urges that "[c]ourts should look to ... interpretations of 'actual or apparent authority' derived from agency theory in order to give the fullest coverage possible." S. Rep. No. 102–249, at 8 (1991). If a commander's subordinates engage in a pattern of crimes about which that commander knew and failed to prevent or repress, then the commander bears responsibility for those acts absent a defense.

The Appellees justify the proximate cause instruction by arguing that a suit brought under the TVPA is a tort action, and, as such, requires proof of causation. This assertion misconceives the point at which causation must be shown. Causation must be demonstrated between the

---

**2.** Only the *en banc* court or the Supreme Court may overrule the precedent established by a prior panel holding. *See, e.g., Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n. 8, 1302–03 (11th Cir.2001); *Turner v. Beneficial Corp.*, 236 F.3d 643, 648–50 (11th Cir.2000), *vacated by* 242 F.3d 1023 (11th Cir.2001) (*en banc*); *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir.1993).

victims' injuries and the armed forces that committed the crimes. Causation, therefore, was undisputedly established in this case: the troops raped and murdered the nuns. Upon proof of its three prongs, the command responsibility doctrine assigns responsibility for those crimes to the commander of the troops, absent any defense.

In *Hilao v. Estate of Marcos*, 103 F.3d 767, 774 (9th Cir.1996), the Ninth Circuit expressly held that proximate cause is not an element of command responsibility. 103 F.3d at 776–779. No federal court considering a case brought under the TVPA has required plaintiffs to show proximate cause between their injuries and the acts or omissions of an executive commander. The ICTY has treated the issue in a manner similar to the *Hilao* Court. The Trial Chamber in *Prosecutor v. Delalic* held that proof of causation is not an independent requirement for the imposition of command culpability. The Trial Chamber noted that there is no causal connection "between an offense committed by a subordinate and the subsequent failure of a superior to punish the offense," and concluded that this demonstrates the absence of causality as an element of the command responsibility doctrine. *See Prosecutor v. Delalic*, Judgment (Trial Chamber ICTY, Nov. 16, 1998) ¶¶ 398–400.

Indeed, a proximate cause requirement practically eviscerates the command responsibility doctrine's theory of liability. It is not surprising, therefore, that no opinion addressing the doctrine includes proximate cause as a required element of proof. Instead, case law consistently asserts that commanders with executive responsibility who know or should know of a pattern or practice of abuse face a high presumption of liability, and causation is presumed to be the result of their failure to prevent those individual crimes.

Second, it is clear that the proximate cause instruction in this case confused the jurors, a fact demonstrated by four of the five questions of the jury to the court. Question 2 inquired: "Our obligation as jurors is to determine the guilt or innocence based on the three questions under command responsibility only?" Similarly, Question 3 asked: "Are there any other criteria other than command responsibility that we have to concern our decision with?" Question 4 pondered whether liability turned on the General's responsibility for the "crimes against the people of El Salvador as a whole" or just the crimes against the nuns. And finally, Question 5 asked for reassurance of the jury's understanding of the importance of proximate cause: "[I]t seems that proximate cause ... becomes a logical element, number four [in addition to the three prongs of the command responsibility doctrine] if and only if 1[,] 2[,] and three [sic] have been clearly established." These questions show that the jury may have found the Generals responsible for the crimes against the nuns but for the court's erroneous proximate cause instruction. The questions also make clear that the jury instructions left "the jury to speculate as to an essential point of the law," an error "sufficiently fundamental to warrant a new trial despite a party's failure to state a proper objection." *Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074, 1083 (11th Cir.1987) (quotation omitted). The erroneous proximate cause instruction thus led to "substantial injustice" warranting reversal of this judgment because the juror questions offer strong evidence of confusion and suggest that the jury's determination was significantly influenced by a legally erroneous instruction.

I believe that the requirements of justice would be served in this case by a rule

that would permit us to review an "invited" but erroneous jury instruction where there is no evidence that counsel for the objecting party permitted the error in bad faith, and where it is clear that the jury misperceived the law and based its determination on this misperception.