[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 6, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-10361

_____

D. C. Docket No. 02-23248-CV-UUB

MAX SAEWITZ,
LYNN SAEWITZ,

Plaintiffs-Appellees,

versus

LEXINGTON INSURANCE COMPANY,
a foreign corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 6, 2005)

Before DUBINA, PRYOR, and RONEY, Circuit Judges.

PER CURIAM:

Lexington Insurance Company (Lexington) appeals several rulings of the

district court in favor of Max and Lynn Saewitz, homeowners who submitted to Lexington a claim for extensive damage caused by a leak from the commercial-grade refrigerator on the second floor of the Saewitzes' home. This appeal presents four issues (1) whether the partial payment of the Saewitzes' claim by Lexington constituted an admission of coverage for that amount; (2) whether the district court correctly refused to allow Lexington to amend its pleadings and assert an affirmative defense of fraud and concealment more than a month after the close of discovery and six months after the deadline for amending pleadings; (3) whether the district court correctly limited the testimony of an expert witness Lexington called because plenary testimony by the expert would have been unduly prejudicial; and (4) whether the district court abused its discretion when it denied a motion for remittitur because the motion was contrary to the jury instructions and verdict form to which Lexington did not object. We affirm.

## I. BACKGROUND

This appeal arises from a complaint for breach of contract filed by the Saewitzes against Lexington. We begin by recounting the facts that led to the filing of the Saewitzes' complaint and then address the procedural history of this litigation.

2

*A. Factual Background*

On October 15, 1999, the home of Max and Lynn Saewitz in Coconut Grove, Florida, was extensively damaged by Hurricane Irene. The Saewitzes engaged a public insurance adjuster to evaluate their losses, which they reported to their insurance carriers. In March 2000, Gerald DeMarco was assigned by the Saewitzes' flood and windstorm insurance carrier to evaluate the damage to their home. DeMarco reported two evaluations of the damage incurred by the Saewitz home, complete with photographs, in April 2000. By October 2000, the Saewitzes received their final insurance payment to compensate them for the approximately $1.1 million in damage to their home caused by the hurricane. None of the damage caused by Hurricane Irene was covered by the Saewitzes' policy with Lexington, which they purchased in May 2000.

On July 5, 2000, the Saewitzes discovered a water leak from the large refrigerator in their second-floor kitchen. The refrigerator is fed by condensers on the roof of the house, and a drain pan underneath the refrigerator holds accumulated condensation from the unit until the condensation evaporates. The refrigerator repairman who first inspected the leak said that the lines that connected the refrigerator and the roof condensers were producing condensation, which was damaging the wall behind the refrigerator, and the drain line from the refrigerator

was clogged, which caused an overflow in the drain pan because the device in the freezer that helped evaporate run-off condensation was not working correctly.

The Saewitzes promptly hired a public insurance adjuster who reported this problem to Lexington, and Lexington assigned an insurance adjuster to evaluate the claim. The insurance adjuster hired by Lexington engaged an engineer and a general contractor, and in July 2000 they inspected the area of the house damaged by the refrigerator leak. After the inspections were complete, the engineer reported that the wood rot in the joists and sub-floor of the kitchen was so pronounced that the back legs of the refrigerator sunk into the rotted floor; there was wood rot in the wall behind the refrigerator; and there was wood rot and damage to the cedar closet that shared the wall abutting the rear of the refrigerator. The Saewitzes also claimed damage to the cedar closet on the first floor, which was located below the damaged closet that shared the wall adjoining the rear of the refrigerator.

Lexington and the Saewitzes exchanged estimates for repair work, replacement of the damaged wood, and the cost of re-tiling the floor of the Saewitzes' kitchen after the work on the sub-floor was completed. Eventually, Lexington offered to pay the Saewitzes $240,055.81 to cover their losses, which they accepted, on May 1, 2001, as a partial payment for their claim. Lexington and the Saewitzes continued to dispute the remaining amount owed to the Saewitzes

4

under their policy.

*B. Procedural History*

The Saewitzes sued Lexington in the Southern District of Florida on November 5, 2002. They sought payment under their insurance policy to repair the damage from the refrigerator leak to the second floor kitchen, including the closet that adjoined the wall at the rear of the refrigerator, and the damage to the first floor of their home where the water that leaked from the refrigerator had seeped down. Lexington answered and asserted seven affirmative defenses. Lexington asserted as one affirmative defense that the damage to the Saewitzes' home was caused by Hurricane Irene, rather than the refrigerator leak, but Lexington did not seek repayment of the $240,055.81 it had already paid to the Saewitzes for the refrigerator leak.

The Saewitzes designated DeMarco, formerly employed by their flood and windstorm insurance carriers, as an expert who would testify regarding the damage to the first floor and structure of their home. The Saewitzes disclosed DeMarco's expert report to Lexington, and DeMarco was deposed during discovery. As the litigation progressed, the Saewitzes abandoned the claim for damages related to the first floor of their home. The Saewitzes withdrew DeMarco as an expert witness, and they moved to exclude DeMarco's testimony and expert report at trial if

5

Lexington sought to introduce that as evidence. The district court ruled that, although DeMarco's testimony and report were relevant to both abandoned and live claims, allowing Lexington to call DeMarco or rely on his expert report would result in unfair prejudice to the Saewitzes.

The Saewitzes also moved for partial summary judgment against Lexington based on the May 1, 2001, payment of $240,055.81 by Lexington to settle a portion of the Saewitzes' claim. The district court concluded that, under Florida law, the partial settlement by Lexington constituted an admission of coverage in favor of the Saewitzes for $240,055.81. The district court explained that the "payment constitutes a confession that" the losses for which Lexington "paid $240,055.81 were covered under the policy and were caused by the refrigerator leak."

On August 20, 2003, Lexington moved to amend its answer, under Federal Rules of Civil Procedure 15 and 16, to assert an affirmative defense of fraud and concealment. Lexington argued that, because of information it learned during its recent deposition of the Saewitzes' experts, Lexington could assert fraud and concealment on theory that some of the claimed damages were, in fact, caused by Hurricane Irene. The district court ruled that Lexington would not be allowed leave to amend its answer for two reasons: first, the motion for leave to amend,

filed more than six months after the deadline for amendment of pleadings, was untimely; and second, the district court was unwilling to reopen discovery, which the court had already extended for one month past the initial deadline.

The Saewitzes' suit against Lexington went to trial in November 2003. After a four-day jury trial, the jury returned a verdict in favor of the Saewitzes and awarded them $260,000 in damages. After the jury returned its verdict, Lexington renewed its motion for judgment as a matter of law or, in the alternative, a motion for a new trial or, as a third alternative, a motion to remit the damages to $4944.19. The district court denied that motion. Lexington then filed this appeal.

## II.  ANALYSIS

Lexington appeals matters that occurred before and after trial. Lexington challenges the rulings of the district court on the three pretrial motions, and Lexington argues that the district court erred when it denied the motion for remittitur. We address each argument in turn.

### A.  Partial Summary Judgment Was Appropriate Under Florida Law, Because the Pretrial Payment of $240,055.81 Was an Admission of Liability.

The first pretrial ruling that Lexington appeals is the grant of summary judgment to the Saewitzes regarding the $240,055.81 Lexington paid as partial settlement of their claim. Lexington argues that the district court erroneously removed from the jury the decision whether the Saewitzes' claims occurred within

7

the policy coverage dates and, therefore, eliminated the opportunity for the jury to decide if the damages for which Lexington paid were caused by Hurricane Irene. Lexington also argues that the facts known when summary judgment was granted did not show the extent to which the Saewitzes were compensated by other insurance companies for their losses in Hurricane Irene.

"We review a grant of summary judgment de novo," and we "view the record and draw all reasonable inferences in the light most favorable to" Lexington. Higdon v. Jackson, 393 F.3d 1211, 1218 (11th Cir. 2004). "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. A genuine factual dispute exists if the jury could return a verdict for the non-moving party." Id. (internal citations and quotation marks omitted)

The record is undisputed that Lexington made a $240,055.81 partial payment of the Saewitzes' claim in May 2001. "In Florida, the payment of a settlement claim is the functional equivalent of a confession of judgment or a verdict in favor of the insured." Pepper's Steel & Alloys, Inc. v. United States, 850 So. 2d 462, 465 (Fla. 2003) (citing Wollard v. Lloyd's & Cos. of Lloyd's, 439 So. 2d 217, 218-19 (Fla. 1983)). The district court correctly ruled that the payment of $240,055.81, a portion of the damages the Saewitzes sought, was an admission of

8

coverage under the policy.

Lexington did not preserve its right to contest coverage. Lexington could have made its partial payment with a reservation of rights, alleged an affirmative defense of fraud or mistake regarding its partial payment, or filed a counterclaim against the Saewitzes to recover the $240,055.81. Lexington did not choose any of those three courses of action. Instead, Lexington asserted that the amount it paid should have been regarded as disputed by the parties. Because of the failure of Lexington to preserve any argument to the contrary, the payment by Lexington of$240,055.81 in May 2001 as a partial settlement of the Saewitzes' claims was an admission of liability for that amount.

*B. The District Court Did Not Abuse Its Discretion When It Refused to Allow Lexington to Amend Its Pleadings After the Close of Discovery.*

Lexington argues that the district court erred when it denied Lexington the opportunity to amend its pleadings and assert a new affirmative defense of fraud and concealment against the Saewitzes. Lexington contended that only after the deposition of the Saewitzes' experts did it learn of the operative facts to support the defense. We disagree.

To constitute reversible error, the district court must have committed a "clear abuse of discretion" when it denied Lexington the opportunity to amend. Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1218 (11th Cir. 2004).

9

Although the decision to allow a party leave to amend is discretionary, under Rule 15(a) "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "In making this determination, a court should consider whether there has been undue delay in filing, bad faith or dilatory motives, prejudice to the opposing parties, and the futility of the amendment." Local 472 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting v. Ga. Power Co., 684 F.2d 721, 724 (11th Cir. 1982) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962)).

Because Lexington moved to amend after the deadline in the scheduling order, Federal Rule of Civil Procedure 16, which requires a showing of good cause to modify a scheduling order, is also relevant:

> District courts are required to "enter a scheduling order that limits the time to ... join other parties and to amend the pleadings ...." Fed. R. Civ. P. 16(b). Such orders "control the subsequent course of the action unless modified by a subsequent order," Fed. R. Civ. P. 16(e), and may be modified only "upon a showing of good cause." Fed. R. Civ. P. 16(b). This good cause standard precludes modification unless the schedule cannot "be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16 advisory committee's note; see also Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir.1992) ("If [a] party was not diligent, the [good cause] inquiry should end.").

Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1418 (11th Cir. 1998).

A total lack of diligence by Lexington doomed its request for leave to

10

amend. Lexington not only knew of the potential overlap in the claims for damage caused by Hurricane Irene before the deadline for amendment of pleadings expired, Lexington knew of and had documentation to support the facts underlying its newly-proposed affirmative defense before litigation even began. Because Lexington failed, in every respect, to show diligence in presenting its affirmative defense of fraud and concealment to the district court, Lexington did not establish good cause to modify the scheduling order. Sosa, 133 F.3d at 1418. The district court did not commit a "clear abuse of discretion," Carruthers, 357 F.3d at 1218, when it denied Lexington leave to amend more than six months after the deadline so Lexington could assert a new affirmative defense and reopen discovery more than a month after the already-extended time for discovery had closed. This case is the classic example of an "undue delay in filing." Foman, 371 U.S. at 182, 83 S. Ct. at 230.

### C. The District Court Correctly Granted the Motion in Limine Regarding DeMarco's Testimony and the Use of His Report.

The third argument of Lexington is that the district court erroneously granted the motion in limine that prevented DeMarco, who was formerly listed as a testifying expert by the Saewitzes, from testifying regarding his work on behalf of the Saewitzes or disclosing his report to the jury. "The district court has broad discretion in determining whether to admit or exclude expert testimony, and its

11

decision will be disturbed on appeal only if it is manifestly erroneous." Evans v. Mathis Funeral Home, Inc., 996 F.2d 266, 268 (11th Cir. 1993). This argument fails.

Lexington argues that the district court erred because DeMarco could have testified that some of the damages that the Saewitzes claimed were caused by the refrigerator leak were, in fact, caused by Hurricane Irene, but the district court correctly relied on our precedents regarding Federal Rule of Evidence 403. We have explained that "the unfair prejudice resulting from disclosing" the fact that an expert was previously retained by a plaintiff, but was called to testify only by the defendant "usually outweighs any probative value." Peterson v. Willie, 81 F.3d 1033, 1038 (11th Cir. 1996). The district court allowed two other witnesses for Lexington to present testimony substantially similar to the testimony DeMarco was prevented from giving. The district court also allowed DeMarco to testify as a fact witness regarding his observations and impressions formed during the inspection of the Saewitz home after Hurricane Irene. Any further testimony Lexington could have elicited from DeMarco likely would have supported the fraud and concealment theory Lexington was specifically prohibited from presenting because of its failure timely to amend its answer to assert that theory. See Part II.B. It was not "manifestly erroneous" for the district court to prevent DeMarco from

testifying regarding the work he did for the Saewitzes as an expert.  Evans, 996

F.2d 268.

### D.  The District Court Did Not Abuse Its Discretion when It Denied the Motion for Remittitur of Lexington.

The final argument of Lexington is that the district court erred when it

denied the motion for remittitur.  Lexington argues that remittitur was necessary

because the jury awarded the Saewitzes an amount of total damages, from which a

deduction of the $240,055.81 Lexington paid as a partial settlement was necessary.

This argument also fails.

We review the denial of a motion for remittitur for abuse of discretion.

Mason v. Ford Motor Co., Inc., 307 F.3d 1271, 1276 (11th Cir. 2002).  As

Lexington conceded in its initial brief, the jury instructions and verdict form were

"plain and unambiguous."  The instructions to the jury explained that, if the

$240,055.81 Lexington paid as a partial settlement was the only amount that the

Saewitzes were owed, then the jury would have to return a defense verdict:

> It is undisputed that on May 1, 2001, the defendant paid to the plaintiffs $240,055.81 as partial payment for damages caused by a refrigerator leak.  This Court has determined that under Florida law defendant's payment consitutes a confession that the damages for which it paid $240,055.81 were covered under the policy and were caused by the refrigerator leak.
> Plaintiffs contend that additional damage was caused to their home as a result of the leak for which the defendant has refused to pay. ...

13

If you find from a preponderance of the evidence that the defendant paid for all damages resulting from the refrigerator leak when it made payment in May 2001, and no other damages were caused to the home by the refrigerator leak, then your verdict must be in favor of the defendants and against the plaintiffs.

Lexington did not object to the jury instructions.

The verdict form was similarly worded and presented the jury with two questions: first, whether Lexington failed to pay the Saewitzes any damages caused by the refrigerator leak and, second, if Lexington owed the Saewitzes any damages, how much was owed:

1. Do you find from a preponderance of the evidence that Defendant failed to pay for any of the damages caused by the refrigerator leak.

   YES ____          NO ____

   If your answer to the first question is No, then you should proceed no further as your verdict is for the Defendant, and you should proceed to sign and date this Verdict Form and return it to the Court. If your answer to the first question is Yes, then please answer the following questions.

2. What sum of money do you find from a preponderance of the evidence to be the amount of the Plaintiffs' damages resulting from the refrigerator leak?

The jury marked the first question "yes" and then answered that the Saewitzes were entitled to $260,000 in damages. Lexington did not object to the verdict form.

Lexington argues that the instructions and verdict form, when read together, required the district court to deduct the amount of the partial settlement from the

14

damages in the verdict, but that argument is directly contrary both to our reading of the verdict form and the understanding of the verdict form that the attorney for Lexington explained during his closing argument. The attorney for Lexington argued repeatedly that the jury should prevent the Saewitzes from taking anything above the partial settlement Lexington paid in May 2001 by answering "no" on the verdict form:

> The question that you're going to be called upon to answer on the verdict form, it says: Do you find from a preponderance of the evidence that [Lexington] failed to pay for any of the damages caused by the refrigerator leak.
> *And that's a question that you should answer no.* Lexington did not fail to pay for any of the damages caused by the refrigerator leak in this case. It didn't pay for all the damages to the house. Didn't pay [the Saewitzes] for everything that they want to be paid for. Didn't pay them for Hurricane Irene damage once they found out what was really going on in this case. But [Lexington] did pay for all of the damages caused by the refrigerator leak.
> Now, the other instructions, or some of the other instructions that the Court is going to give you, the Judge is going to instruct you that Lexington's payment constituted a confession that the damages for which it paid $240,000, namely, that discrete group of things they paid for, were covered under the policy and were caused by the refrigerator leak. So we can't dispute that. Whether we made a mistake or not, it's a quirk of the law and we're stuck with that, and that's fine. We're not looking to get our money back for what we did.

The attorney for Lexington later reminded the jury that, because the Saewitzes were entitled to nothing above the partial settlement, the jury should answer "no" on the verdict form:

So, have they been paid enough money as a result of this refrigerator leak? Yes, they have, ladies and gentlemen.

On that verdict form–you're going to be sent back to the jury room. I won't have a chance to talk to you again. I won't have a chance to respond to anything that [the Saewitzes' attorney] says to you. But on that verdict form it's going to ask you do you find from a preponderance of the evidence that [Lexington] failed to pay for any of the damages caused by the refrigerator leak. And you're going to be instructed it's got to be damage that occurred during this policy term.

*And the answer to that is, no, Lexington did not fail to pay for legitimate damages resulting from this refrigerator leak.* The plaintiff has been paid enough money for the damages to his house. It's time for the gravy train to end as far as this claim and the damage that they have to this house.

In his final rhetorical flourish, the attorney for Lexington reiterated that the Saewitzes were not entitled to damages beyond their partial settlement:

What they claim is not from a refrigerator leak. So, I would ask that you do the right thing. Do justice. *Say no to the plaintiffs for any more money here.* Nothing more for you, Mr. and Mrs. Saewitz. Enough is enough. With all due respect, you've been fairly and adequately compensated for this damage to your house. It didn't happen during the policy term. Didn't happen as a result of this. It's something that was there before, and you're not entitled to get it under this policy.

The attorney for Lexington maintained throughout his closing argument that the only way to keep the Saewitzes from taking anything above the $240,055.81 Lexington already paid was for the jury to mark "no" on the verdict form. After the jury answered "yes," the jury determined the amount of damages still owed to the Saewitzes.

The argument Lexington makes now is invited error. "It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." Birmingham Steel Corp. v. Tenn. Valley Auth., 353 F.3d 1331, 1341 n.5 (11th Cir. 2003) (quoting Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1293-94 (11th Cir. 2002)). Lexington did not object to either the jury instructions or the verdict form. The first complaint of Lexington came when it filed its motion for remittitur, which directly contradicted the closing argument of its attorney. The district court did not abuse its discretion when it denied that motion.

## III. CONCLUSION

The district court correctly granted partial summary judgment against Lexington because, under Florida law, the May 2001 payment as a partial settlement was an admission of liability for that amount. The district court also did not abuse its discretion when it denied the belated motion of Lexington to amend its answer and granted the Saewitzes' motion in limine. Finally, the district court did not abuse its discretion when it denied the motion for remittitur, because counsel for Lexington advocated the reading of the verdict form about which Lexington now complains. The rulings of the district court are, therefore,

**AFFIRMED.**

17