[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15959
_____

D.C. Docket No. 1:11-cr-00075-MHS-1


UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

RICK A. KUHLMAN,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 8, 2013)

Before HULL, WILSON and ANDERSON, Circuit Judges.

WILSON, Circuit Judge:

Dr. Rick Kuhlman pleaded guilty to perpetrating a five-year, $3 million health care fraud scheme. He was sentenced to probation for the "time served" while out on pre-trial release awaiting his sentence. Although the United States Sentencing Guidelines set forth a sentencing range of 57 to 71 months of imprisonment, Kuhlman was able to avoid a custodial sentence by simply paying the money back and performing community service, including speaking to medical and nursing students about the perils of health care fraud. Because we agree with the government that Kuhlman's sentence is unreasonable, we vacate the sentence and remand this case back to the district court so that a meaningful sentence may be imposed.

## I. BACKGROUND

### A. The Fraudulent Billing Scheme

Kuhlman is a doctor of chiropractic medicine. He owns and operates five clinics in the Atlanta, Georgia metropolitan area, and one clinic in Nashville, Tennessee. Beginning in January 2005, Kuhlman embarked on what would be a five-year scheme, falsely billing health insurance companies for services he knew were not rendered to his patients.

Normally after treating a patient, Kuhlman would request payment for the medical services rendered by submitting a claim form directly to the patient's health insurance company. The form, known as a "Health Care Financing

2

Administration Form 1500" (HCFA 1500), identifies the treatment provided to the patient. Kuhlman was also required to record, on the same form, the appropriate "Physician's Current Procedural Terminology" (CPT Codes). The American Medical Association publishes CPT Codes as a uniform numerical classification of the most common treatments performed by physicians and other medical services providers, including chiropractors. This was the proper procedure.

But Kuhlman did not follow the proper procedure. Instead, Kuhlman recorded CPT Codes for services he knew were not and would not be rendered to patients on the recorded dates. He then submitted the false HCFA 1500 forms to an insurance company for payment. Thereafter, Kuhlman would receive payment for the treatment he never gave.

During his five-year scheme, at least two insurance companies notified Kuhlman that his billing practices did not conform to the proper procedure. In 2006, Kuhlman paid Blue Cross Blue Shield $500,000 to settle a string of contested claims. A few years later, Kuhlman's billing practices were flagged by Aetna; Kuhlman again settled, this time paying $70,000 to resolve the disputed claims. Aetna approached Kuhlman once more in 2009, and at that time, Aetna determined that Kuhlman's claims would be subject to pre-payment review. Kuhlman, however, continued to submit false claims until an FBI agent approached him in August 2010. It was only after the FBI became involved that

3

Kuhlman ceased his improper billing practices.  In total, Kuhlman pocketed $2,944,883 as a result of his fraudulent billing scheme.

## B.  Procedural History

On February 23, 2011, Kuhlman was charged in a criminal information with one count of health care fraud in violation of 18 U.S.C. §§ 1347 and 2.  A few weeks later, on March 1, 2011, he pleaded guilty pursuant to a plea agreement.  At the plea hearing, Kuhlman admitted that he did not steal out of need—he was not in financial trouble and he did not have "creditors breathing down [his] neck asking for money."  Instead, he "was just pushing the envelope and billing for [CPT] codes that [his] doctors weren't doing and once it started and [he] saw that the insurance companies were going to pay for it [he] just didn't fix it and [he] should have."  The court stated: "In other words, you weren't pressed to do it; you saw an opportunity to make money. . . . I am just trying to figure out why somebody like you would get involved in this type of activity when you weren't pressed for money and the creditors weren't pushing you and you weren't building a house and gotten behind."  Sentencing was then set for May 23, 2011.

In preparation for sentencing, the probation office drafted a Presentence Investigation Report, which calculated a base offense level of six, pursuant to U.S.S.G. § 2B1.1.  Kuhlman qualified for an 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because the loss amount was more than $2,500,000.  In

4

addition, because Kuhlman derived more than $1,000,000 in gross receipts from one or more financial institutions—Aetna, Blue Cross Blue Shield, and United Healthcare—the offense level was increased two levels pursuant to U.S.S.G. § 2B1.1(b)(14)(A).  Since Kuhlman abused his position of trust with the insurance companies by billing them for services that were not rendered, the offense level was increased by two levels pursuant to U.S.S.G. § 3B1.3.  Kuhlman, however, was entitled to a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and an additional one-level reduction under U.S.S.G. § 3E1.1(b) for assisting in the investigation by timely notifying authorities of his intention to plead guilty.

After these adjustments, Kuhlman's total offense level amounted to 25, with a criminal history category of one and zero criminal history points.  Based on these numbers, the Sentencing Guidelines advised a range of 57 to 71 months' imprisonment.  As part of the plea agreement, however, the government ultimately recommended a sentence of 36 months' imprisonment, which was effectively a five-level downward variance.  *See* U.S.S.G. § 5A.

On May 23, 2011, the parties appeared ready for sentencing.  A few days before sentencing, Kuhlman paid $2,944,883 in full restitution.  Impressed, the district judge remarked that Kuhlman was the first defendant that the judge could recall who made such a large restitution payment prior to sentencing.

The district court then proceeded to discuss the rising costs of incarceration, citing a recent Georgia state commission formed to explore alternatives to prison for nonviolent criminals.  The court alluded to the fact that Kuhlman needed some extra time to "pay off his fine and support his family."  In addition, if given extra time before sentencing, Kuhlman could, "and should, perform public service."  The court then *sua sponte* continued the sentencing hearing for six months.  In the eyes of the court, the continuance would provide "a more complete picture of [Kuhlman] and how he handle[d] this postponement time before sentencing."

Next, the court repeated its concerns over the rising costs of prison and suggested that a continuance would save "the court . . . at least $10,000 by not incarcerating [Kuhlman] during this period."  The court also noted that it had ordered a similar continuance for a "budding rock star," which had yielded positive results.  During that six month continuance, the "budding rock star" made "hundreds of visits to young people" and had a positive impact on the community. The district court continued, "[t]he case was finally concluded to the satisfaction of all parties who were initially skeptical as to whether the defendant was being sufficiently punished for his wrongdoing."  Kuhlman, the district court believed, could benefit from a similar opportunity.

The government objected, concerned that a continuance would allow Kuhlman to go right back to work and right back to his old routine of filing false

claims with insurance companies.  Kuhlman, for obvious reasons, did not object to the continuance.

Over the next several months, Kuhlman heeded the district judge's advice. Between May 23, 2011, and the time of Kuhlman's continued sentencing hearing on November 15, 2011, Kuhlman logged 391 hours of community service.[1]  He visited various medical, nursing, and chiropractic schools and gave presentations on health care insurance fraud.  He also provided 18 days of free chiropractic services at homeless shelters across Atlanta and painted a gym at an elementary school.  And, as previously stated, Kuhlman had paid back the full amount he stole—$2,944,883—prior to the initial May 23, 2011 sentencing hearing.

At the second sentencing hearing on November 15, 2011, the district court lauded Kuhlman's work during his six-month continuance.  In light of Kuhlman's full restitution payment, his community service, and the rising costs of incarceration, the district court sentenced Kuhlman to probation for the "time served" while awaiting his sentence.  In doing so, the district court varied downward 20 levels.

## II. STANDARD OF REVIEW

---

[1] To log 391 hours of community service during his six-month continuance, Kuhlman would have had to complete roughly two hours of service per day, including Saturdays and Sundays.

7

We review the reasonableness of a sentence under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007). "That familiar standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (internal quotation marks omitted). We have explained that, under the abuse of discretion standard of review, "there will be occasions in which we affirm the district court even though we would have gone the other way." *Id.* (internal quotation marks omitted). The burden of establishing unreasonableness lies with the party challenging the sentence. *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). Here, the government appeals Kuhlman's sentence; thus, the government carries the burden of demonstrating that Kuhlman's sentence is unreasonable.

## III. DISCUSSION

*A. Reasonableness of Sentence*

When reviewing the reasonableness of a sentence, our task is two-fold. We will first

> ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines range.

*Gall*, 552 U.S. at 51, 128 S. Ct. at 597.

8

In explaining the sentence, the district court should set forth enough information to satisfy the reviewing court of the fact that it has considered the parties' arguments and has a reasoned basis for making its decision, *see United States v. Rita*, 551 U.S. 338, 356, 127 S. Ct. 2456, 2468 (2007), but "nothing . . . requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005). If the district court varies from the Guidelines range, it must offer a justification sufficient to support the degree of the variance. *See Irey*, 612 F.3d at 1187.

After we determine that the district court's sentencing decision is procedurally sound, we next review the substantive reasonableness of the sentence for abuse of discretion. *Gall*, 552 U.S. at 51, 128 S. Ct. at 597. We have held that

> [a] district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors. As for the third way that discretion can be abused, a district court commits a clear error of judgment when it considers the proper factors but balances them unreasonably.

*Irey*, 612 F.3d at 1189 (citations and internal quotation marks omitted).

A district court's unjustified reliance on a single factor "may be a symptom of an unreasonable sentence." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008). However, significant reliance on a single factor does not necessarily

9

render a sentence unreasonable. *Id.* at 1192; *see Gall*, 552 U.S. at 57, 128 S. Ct. at 600 (holding that a district court did not commit reversible error simply because it "attached great weight" to one factor). We have held that "[t]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court, and we will not substitute our judgment in weighing the relevant factors." *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007) (alterations and internal quotation marks omitted).

When reviewing a sentence for reasonableness, we also evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing under 18 U.S.C. § 3553(a). *Talley*, 431 F.3d at 788. "In order to determine whether that has occurred, we are required to make the sentencing calculus ourselves and to review each step the district court took in making it." *Irey*, 612 F.3d at 1189 (alteration and internal quotation marks omitted). In reviewing the reasonableness of a sentence, we consider the totality of the facts and circumstances. *Pugh*, 515 F.3d at 1190.

Pursuant to § 3553(a), the sentencing court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, protect the public from future crimes of the defendant, and provide the defendant with needed educational or vocational training or medical care. 18

10

U.S.C. § 3553(a)(2).  The sentencing court must also consider the following factors in determining a particular sentence: the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available, the Guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims.  18 U.S.C. § 3553(a)(1), (3)–(7).  In reviewing the court's application of these factors, we will vacate a sentence

> if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case.

*Irey*, 612 F.3d at 1190 (internal quotation marks omitted).

### B.  Kuhlman's Sentence

The government argues that Kuhlman's sentence is procedurally and substantively unreasonable.  As a preliminary matter, we note that the district court fulfilled its procedural obligations when sentencing Kuhlman to probation for time served.  Neither party disputes that Kuhlman's advisory Guidelines range was calculated accurately at 57 to 71 months.  Rather, the government argues that it was procedurally unreasonable for the district court to disregard the importance of general deterrence, and to conclude that a 20-level variance was justified under the Guidelines.

11

When sentencing a defendant, the district court is not required to "state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." *Scott*, 426 F.3d at 1329. Here, the district court cited several § 3553(a) factors as the basis for varying Kuhlman's sentence below the Guidelines range. As such, Kuhlman's sentence is procedurally reasonable.

We cannot conclude, however, that Kuhlman's sentence is substantively reasonable. He stole nearly $3 million and "did not receive so much as a slap on the wrist—it was more like a soft pat." *United States v. Crisp*, 454 F.3d 1285, 1291 (11th Cir. 2006). To arrive at a sentence of probation for "time served" while out on pre-trial release, the district court varied downward by 57 months from the bottom of the advisory Guidelines range. Such a sentence fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence. The Guidelines specifically state that a sentence should provide "adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). We are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence.

Insurance companies must rely on the honesty and integrity of medical practitioners in making diagnoses and billing for their services. And as the government indicated at oral argument, deterrence is an important factor in the

12

sentencing calculus because health care fraud is so rampant that the government lacks the resources to reach it all. Thus, when the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment.

In awarding Kuhlman probation for the time he served while out on pre-trial release, the district court disregarded the importance of delivering such a message. In fact, Kuhlman's sentence sends the opposite message—it encourages rather than discourages health care providers from engaging in the commission of health care fraud because they might conclude that the only penalties they will face if they are caught are disgorgement and community service. We do not mean to imply that probation can never be an option available to a court in fashioning a reasonable sentence in a white-collar crime case. But not here. That is especially so considering the totality of the circumstances, including Kuhlman's prior history, the nature of the offense, and the extent that the sentence varies from the advisory Guidelines.

In *United States v. Livesay*, we vacated as "patently unreasonable" a sentence of five years' probation for a participant in a billion-dollar fraud scheme, holding that only a "meaningful period of incarceration" would fulfill the goals of sentencing under § 3553(a). 587 F.3d 1274, 1278–79 (11th Cir. 2009). We also

13

specifically addressed the need for adequate deterrence, stating that "it is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence, regardless of how much probation that person received." *Id.* at 1279. The same rationale applies in this case: "The threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *Id.*

We also find the reasoning in *United States v. Martin* analogous to the case before us. 455 F.3d 1227 (11th Cir. 2006). In *Martin*, we vacated a seven-day sentence for another participant in a billion-dollar securities fraud, criticizing the sentence as "shockingly short" and "wildly disproportionate" to the seriousness of the offense, even though the defendant's cooperation with the government was "extraordinary." *Id*. at 1238–39. We also noted that "the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white[-]collar criminals, even where those criminals might themselves be unlikely to commit another offense." *Id*. at 1240. We stated that "[b]ecause economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Id*. (internal quotation marks omitted). Our basis for this determination was that "[d]efendants in white[-] collar crimes often calculate the

14

financial gain and risk of loss, and white[-]collar crime therefore can be affected and reduced with serious punishment." *Id.*

Our decision in *United States v. Crisp* sings a similar tune. 454 F.3d at 1287, 1290. There, we vacated as "outside the range of reasonableness" a sentence of five hours' imprisonment for bank fraud, even though the defendant had provided substantial assistance that was crucial to the prosecution of his co-defendant. *Id*. Specifically, we determined that the district court's "single-minded[]" goal of restitution as the basis for imposing such a short sentence—grounded in the reasoning that the defendant would be more able to pay restitution if he were free—was an "unreasonable approach [that] produced an unreasonable sentence." *Id*. at 1291–92.

In an effort to differentiate his case from *Livesay*, *Martin*, and *Crisp*, Kuhlman argues that each of those cases involved more money or more egregious fraud. We need not dwell, however, on the dollar amount of those schemes, because the criminal motive in each case was the same as the motive here—greed.

Kuhlman knowingly and methodically stole millions of dollars from insurance companies over a period of several years. The district court's sentence does not reflect the seriousness and extent of the crime, nor does it promote respect for the law, provide just punishment, or adequately deter other similarly inclined

15

health care providers.  We therefore find the sentence to be substantively unreasonable, and an abuse of the district court's discretion.

The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.  And we are not the first circuit to recognize that sentences like Kuhlman's are typically unavailable to defendants of lesser means who are convicted of economic crimes.  In a recent decision, the Sixth Circuit flatly rejected a district court's reliance on the defendant's "chosen profession and status in the community," holding that such factors were "decidedly inappropriate to form the basis of such a large downward variance."  *United States v. Peppel*,— F.3d —, 2013 WL 561352, at *11 (6th Cir. Feb. 15, 2013) (vacating seven-day sentence for CEO who participated in an $18 million fraud scheme, which carried a Guidelines range of 97 to 121 months of imprisonment).  So too here.  Like the Seventh Circuit, we encourage our district court colleagues to keep in mind that

> [b]usiness criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.  It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.  But in this instance we must fight our nature.  Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

16

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (internal citation omitted).

Accordingly, we vacate Kuhlman's sentence and remand for resentencing so that the district court may be permitted to impose a reasonable sentence.

**VACATED and REMANDED.**