[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 16-17371

————————————————

D.C. Docket No. 1:16-cr-20173-DPG-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STEPHANIE LOIS WATKINS,
a.k.a. Stephanie Harrell,

Defendant - Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(January 5, 2018)

Before WILSON and ROSENBAUM, Circuit Judges, and TITUS[*], District Judge.

PER CURIAM:

Stephanie Watkins, a native and citizen of Jamaica—and until her deportation in 2003, a lawful permanent resident of the United States—appeals her conviction for reentering the country illegally following deportation. On appeal, Watkins argues that her indictment should have been dismissed because her deportation order was invalid due to a change in what crimes are considered "crimes involving moral turpitude" (CIMTs) as defined by the Immigration and Nationality Act (INA). She also argues that her fingerprints should not have been collected post indictment and that the district court improperly allowed testimony from a fingerprint analyst. The government counters that Watkins cannot collaterally attack her deportation order and that there was no error relating to the fingerprint collection or testimony. After a careful review of the briefs and with the benefit of oral argument, we affirm.

**I.**

Stephanie Lois Watkins became a lawful permanent resident of the United States in 1992. She has lived in the United States since she arrived here with her family when she was just 10 years old. Her two children and her parents are all

---

[*] Honorable Roger W. Titus, United States District Judge for the District of Maryland, sitting by designation.

United States citizens who currently reside here.  All of her siblings also work and reside in the United States.  In 2003, she was deported back to her home country, Jamaica, for having been convicted of Florida grand theft, Fla. Stat. § 812.014(1), a CIMT.  At some point, Watkins returned to the United States.

Following a March 2016 traffic stop, Watkins was arrested.  The license that Watkins gave to the officer who stopped her had been flagged as suspicious.  When the officer warned Watkins that she could be charged with obstruction and other charges if she was lying about her identity, she revealed her real name.  After being taken to police headquarters, Watkins admitted to the officers that her license was fraudulent, that she had been deported, and that she had reentered the country illegally.  She was subsequently indicted for illegally reentering the country after deportation.

Prior to a bench trial, Watkins moved to dismiss the indictment.  She argued that because Florida grand theft was no longer a CIMT, her order of deportation was invalid since she had never been convicted of a CIMT, which also meant that she could not be charged with illegally reentering the United States because she should have never been deported in the first place.  Before the court ruled on her motion, Watkins unsuccessfully moved the BIA to reopen her 2003 case.

In the meantime, the government moved for leave to obtain Watkins's fingerprints in order to compare them to the fingerprints contained in her

3

immigration documents.  It argued that a fingerprint analyst would testify to show identity, namely, that Watkins was the same person who was previously removed from the United States.

After a hearing addressing both matters, the district court denied Watkins's motion to dismiss the indictment and granted the government's motion to obtain Watkins's fingerprints.  At the conclusion of the bench trial, Watkins was convicted and the court sentenced her to time served and one year of supervised release.  She timely appealed.

## II.

In a criminal context, we review collateral challenges to the validity of a deportation order de novo.  *United States v. Zelaya*, 293 F.3d 1294, 1297 (11th Cir. 2002).  We also "review questions of statutory interpretation de novo, but defer to the interpretation of the BIA if it is reasonable."  *Cano v. U.S. Att'y Gen.*, 709 F.3d 1052, 1053 (11th Cir. 2013) (per curiam).

Moreover, we review a district court's evidentiary rulings for an abuse of discretion.  *United States v. Brown*, 415 F.3d 1257, 1264–65 (11th Cir. 2005).  This standard grants the court substantial leeway; reversal is appropriate only when the law, facts, or procedure was incorrectly applied or when there is an otherwise clear error in judgment.  *Id.* at 1265–66.

**III.**

The district court did not err in denying Watkins's motion to dismiss her indictment. Watkins argues that she could not be charged for illegal reentry because her underlying deportation order was based on convictions for Florida grand theft, which, according to Watkins, can no longer be considered a CIMT after the Supreme Court's issuance of *Descamps v. United States*, --- U.S. ---, 133 S. Ct. 2276 (2013). For purposes of our analysis today, because it makes no difference in the outcome of Watkins's case, we assume without deciding that Watkins is correct in asserting that a conviction for Florida grand theft no longer qualifies as a CIMT. Thus, we are left to decide the question of whether Watkins can collaterally challenge her underlying deportation order.

To collaterally attack or challenge the validity of her underlying deportation order, Watkins must show all three of the following requirements: (1) that all available administrative remedies have been exhausted; (2) that the deportation proceedings deprived her of the opportunity for judicial review; and (3) that the deportation proceedings were fundamentally unfair. 8 U.S.C. § 1326(d). We focus on Watkins's inability to show that she was denied judicial review in explaining why her claim fails.

Two Supreme Court cases establish the contours of this requirement that a litigant demonstrate that she did not have the opportunity for judicial review:

5

*Lewis v. United States*, 445 U.S. 55 (1980), and *United States v. Mendoza-Lopez*,

481 U.S. 828 (1987).  We begin with *Lewis*.  In that case, Lewis was indicted for

being a convicted felon in possession of a firearm, in violation of federal law.

*Lewis*, 445 U.S. at 57.  Lewis sought to defend himself on the basis that his

underlying state conviction was invalid because he had not been represented by

counsel in the proceedings that led to that conviction.  *Id.* at 57-58.  Based on the

language of the federal law, the Supreme Court concluded that "one's status as a

convicted felon should cease only when the conviction upon which that status

depends has been vacated."  *Id.* at 61.  So Lewis could not collaterally challenge

his state-court conviction in the context of his federal-court proceedings.  *Id.* at 61-

65.  Critical to the Court's conclusion was its observation that "a convicted felon is

not without relief."  *Id.* at 64.  As the Court explained, before obtaining a firearm, a

convicted felon could absolve himself of his convicted status for purposes of the

federal statute by obtaining a qualifying pardon or the Secretary of the Treasury's

consent, or by challenging his prior conviction in state court.  *Id.*

Seven years later, the Supreme Court decided *Mendoza-Lopez*, the case that

resulted in the amendment of § 1326 to include § 1326(d)'s provisions for

collaterally attacking an underlying conviction.  In *Mendoza-Lopez*, the Court

considered whether an undocumented immigrant who is prosecuted under 8 U.S.C.

§ 1326 for illegal entry after deportation may, in the criminal proceeding,

6

challenge the validity of the underlying deportation order. *Mendoza-Lopez*, 481 U.S. at 830. In the criminal proceeding, the district court had concluded that the petitioners had not made knowing and intelligent waivers of their rights to apply for suspension of deportation or their rights to appeal because their questions about these issues had not sufficiently been answered during the deportation proceedings. *Id.* at 832. The petitioners sought to set aside their deportation orders on that basis. In considering what to do, the Supreme Court first acknowledged, like the *Lewis* Court had with respect to the federal statute at issue there, that the language and legislative history of § 1326 do not supply a basis for concluding that Congress intended in the § 1326 prosecution to allow challenges to the validity of the underlying deportation. *Id.* at 834-37.

Nevertheless, the Court concluded that due-process considerations require that the underlying deportation be subject to "meaningful review" before it may be used as a basis for proving an element of a § 1326 prosecution. *Id.* at 837-38. Further defining what it meant by "meaningful review," the Supreme Court explained, "This principle means at the very least that where the defects in an administrative proceeding *foreclose* judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense." *Id.* at 838 (emphasis added). The Court continued, "[A] collateral

7

challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding *effectively eliminates* the right of the [undocumented immigrant] to obtain judicial review." *Id.* at 839 (emphasis added). And "[e]ven with this safeguard," the Supreme Court expressed concern over the use of an administrative proceeding to establish an element of a criminal offense." *Id.* at 838 n.15.

The main feature distinguishing *Mendoza-Lopez* from *Lewis* is the lack in *Mendoza-Lopez* of a meaningful opportunity for the petitioners to challenge the underlying deportation order—in that case, because the petitioners were deprived in the deportation proceedings themselves of the opportunity by the administrative judge's obtaining of unknowing and unintelligent waivers of the rights to apply for suspension of deportation and to appeal.

Applying these lessons to Watkins's case, we cannot say that she was similarly deprived of a meaningful opportunity for judicial review of her deportation order. True, Watkins could not have raised her *Descamps* claim within 30 days of when the final administrative decision was rendered, *see* 8 U.S.C. § 1252(b)(1), because *Descamps* was not decided until ten years after that.

But besides seeking that type of judicial review of a deportation order, an undocumented immigrant may file a motion to reopen deportation proceedings and may seek judicial review of those proceedings if dissatisfied with the BIA's

8

decision.[1]  Under 8 U.S.C. § 1229a(c)(7)(C)(i), an undocumented immigrant may file one motion to reopen proceedings, provided that he or she does so within 90 days of the entry of a final administrative order of removal.  Of course, 90 days beyond the issuance of the 2003 final administrative order would not have done much good for Watkins because, as we have noted, her claim is based on *Descamps*, which did not issue until 2013.

But equitable tolling applies to the 90-day deadline to seek reopening. *Avila-Santoyo v. U.S. Att'y Gen.*, 713 F.3d 1357, 1362-63 (11th Cir. 2013) (en banc).  And the BIA has suggested in unpublished opinions—including in Watkins's case—that the equitable-tolling doctrine applies with equal force to the number bar.  *See*, *e.g.*, *In re: Stephanie Lois Watkins*, 2017 WL 1230039, *1 (BIA Feb. 15, 2017) ("[T]he filing restrictions imposed on motions to reopen are subject to equitable tolling.") (citing *Avila-Santoyo*, 713 F.3d at 1365).  So if equitable tolling could have provided Watkins with a meaningful opportunity to seek and obtain the BIA's reopening of her deportation order following the issuance of *Descamps*, the district court's decision denying Watkins collateral review of the deportation order in the context of the § 1326 proceedings did not run afoul of § 1326(d).

---

[1] BIA may *sua sponte* reopen proceedings, but we have held that BIA's decision to deny *sua sponte* reopening is not judicially reviewable, so we do not include that in our discussion.  *See Butka v. U.S. Att'y Gen.*, 827 F.3d 1278, 1283-86 (11th Cir. 2016).

We therefore review whether Watkins sought and the BIA considered equitable tolling in Watkins's case. The record shows that the answer to both inquiries is "yes." To establish entitlement to equitable tolling, a petitioner must show "(1) that [s]he had been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *Avila-Santoyo*, 713 F.3d at 1363 n.5 (citation and quotation marks omitted). The BIA declined to equitably toll the statutory requirements for filing a motion to reopen because it concluded that Watkins had not pursued her rights diligently, and she had similarly failed to show that any extraordinary circumstance prevented her from doing so:

> The respondent filed the instant motion to reopen on August 1, 2016, more than 3 years after the issuance on June 20, 2013, of the decision in *Descamps* . . . . In her motion, the respondent has offered no explanation for the filing delay other than to emphasize that she could not have moved to reopen the proceedings prior to the issuance of the decisions of the Supreme Court. . . .

*Watkins*, 2017 WL 1230039, at *1.

Watkins could have sought judicial review of this conclusion, but she did not do so, though nothing prevented her. For this reason, Watkins was not deprived of a "meaningful opportunity" for judicial review, and she may not collaterally attack her underlying deportation order in these § 1326 proceedings.[2]

---

[2] We nevertheless note that we agree with the BIA that waiting more than three years to seek to set aside her deportation order after the means to challenge that order became available does not demonstrate diligence. And Watkins did not even try to explain why she waited that long.

10

## IV.

There was also no reversible error in the district court's evidentiary decisions.  The district court did not abuse its discretion in permitting the government to collect Watkins's fingerprints.  Neither the Fifth Amendment's privilege against self-incrimination nor the Fourth Amendment's privacy protections shield a defendant from being compelled to become "the source of real or physical evidence." *Schmerber v. California*, 384 U.S. 757, 764, 86 S. Ct. 1826, 1832 (1966) (internal quotation marks omitted).  Thus, Watkins was afforded no constitutional protections regarding compulsion to provide her fingerprints.

However, the district court likely erred, albeit harmlessly, in admitting the fingerprint analyst's expert testimony.  The Federal Rules of Evidence state that expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  We use a three-part inquiry to assess the admissibility of expert testimony by evaluating (1) qualification, (2) reliability, and (3) helpfulness. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). Qualification can be based on the proposed expert's training and experience. *Id.*

11

at 1260–61.  The court has considerable leeway in determining what is reliable, as long as it its determination is done in light of the *Daubert*[3] factors.  *Id.* at 1262.  And helpfulness is based on whether the testimony "concerns matters that are beyond the understanding of the average lay person."  *Id.*  Here, the fingerprint analyst's testimony was probably not reliable.  The analyst did not specifically testify about her scientific methods and her testimony may not have been based on sufficient facts or data.  *See id.* at 1260, 1262.

But again, the district court's error in admitting the testimony was harmless.  The fingerprint analyst's testimony was admitted to show Watkins's identity as the person who was previously deported, but other evidence supported that contention—testimony from a United States Citizenship and Immigration Services (USCIS) records manager and testimony from a Department of Homeland Security (DHS) agent.  Watkins herself also admitted that fact repeatedly.  Thus, any error was harmless.  *See United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005).

## V.

Although sympathetic to Watkins's predicament and her separation from her entire family, we must affirm the ruling of the district court.  She is unable to meet the requirements that would allow for a collateral attack of her underlying

---

[3] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

deportation order.  Moreover, the district court's evidentiary rulings were either not erroneous or, if they were, the error was harmless.  Thus, Watkins's conviction is affirmed.

**AFFIRMED.**