[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14928
Non-Argument Calendar

_____

D.C. Docket No. 6:09-cr-00248-PGB-KRS-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMON LOPEZ-ALVARADO,

Defendant-Appellant.


_____

No. 18-14930
Non-Argument Calendar

_____

D.C. Docket No. 6:18-cr-00080-PGB-KRS-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMON LOPEZ-ALVARADO,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(May 1, 2020)

Before WILSON, FAY and ANDERSON, Circuit Judges.

PER CURIAM:

Ramón Lopez-Alvarado, a citizen of Mexico, appeals following his convictions and sentences for illegally re-entering the United States after deportation and failing to register as a sex offender under the Sex Offender Registration and Notification Act ("SORNA"), and the revocation of his supervised release for committing those two offenses.  We affirm.

**I.**

In 2009, federal authorities charged Lopez-Alvarado with one count of failing to register as a sex offender, in violation of 18 U.S.C. § 2250.  CM/ECF for the M.D. Fla, no. 6:09-cr-00248-PGB-KRS-1 ("*Lopez-Alvarado I*").  In 2012, he pled guilty pursuant to a plea agreement.  Based on the plea agreement's factual basis, he admitted that in 1998, he pled guilty in state court to three counts of committing a lewd act upon a 12-year-old child, in violation of Florida Statutes §

2

800.04.  He likewise admitted to being deported to Mexico after those convictions, but illegally re-entering the United States, which prompted the state court to find him guilty of violating probation.  He admitted to being sentenced for the probation violation, serving part of that sentence, being deported again to Mexico, and returning to the United States later without permission.

The district court sentenced Lopez-Alvarado to 15 months of imprisonment, followed by five years of supervised release, which, in relevant part, prohibited him from violating any federal, state, or local law and required him to register, in any state in which he resided, with the state's sexual offender registry and/or SORNA.  The district court entered a final judgment in *Lopez-Alvarado I* in December 2012.  He appealed; we affirmed in July 2013 after granting counsel leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967).  *United States v. Lopez-Alvarado*, 523 F. App'x 718 (11th Cir. 2013).  Lopez-Alvarado completed his custodial sentence and commenced his five-year supervised release term shortly thereafter.  He was later deported.

In 2018, authorities charged Lopez-Alvarado with additional violations. First, in March 2018, the probation office sought to have him arrested, alleging, in part, that he had returned to the country without permission in 2018.  Proceedings then commenced to revoke his supervised release in *Lopez-Alvarado I*.

3

In April 2018, a federal grand jury charged Lopez-Alvarado with: (1) illegally being present in the United States after being deported, in violation of 8 U.S.C. § 1326(a), (b)(2) (Count 1); and (2) knowingly failing to register as a sex offender under SORNA, in violation of 18 U.S.C. § 2250(a) (Count 2). CM/ECF for the M.D. Fla., no. 6:18-cr-00080-PGB-KRS-1 ("*Lopez- Alvarado II*"). Because Lopez-Alvarado previously had been convicted of failing to register as a sex offender and was on federal supervised release for that conviction, the probation office also filed a petition alleging that he had violated the conditions of his release by illegally returning to the United States.

Lopez-Alvarado appeared before a magistrate judge for a change of plea hearing as to Count 2 and pled guilty; the magistrate judge recommended the district court accept his plea. Both sides submitted notices that they had no objections to the recommendation and the district court accepted his guilty plea to Count 2.

Prior to trial on Count 1, the government moved to preclude Lopez-Alvarado from raising, as a defense, that he became a naturalized citizen by taking or signing an allegiance oath at a naturalization interview in 1995. The district court ultimately ruled that it would be a factual issue for the jury to decide whether it believed Lopez-Alvarado was invited to a ceremony to take the oath, whether the absence of immigration records indicated that never occurred, and whether he took

4

the oath and became a citizen.  When asked by the district court for comments, neither side objected to the court's ruling.

At the jury trial, Charles Adkins, a senior immigration officer for the United States Citizenship and Immigration Services ("USCIS"),[1] testified for the government regarding Lopez-Alvarado's "alien file," also called an "A-file."[2] Adkins identified a notice to appear for removal proceedings issued to him in August 1998; a December 1998 order from an Immigration Judge finding that Lopez-Alvarado was removable, "ineligible for relief from removal," and ordering him removed to Mexico; a warrant for his removal, based on a final order from the Board of Immigration Appeals, which demanded his physical removal from the United States; and an execution page showing he was removed from the country and walked across the border to Mexico on May 30, 2009.  Adkins also testified regarding another time Lopez-Alvarado entered the country and was removed, with removal proceedings beginning around July 2012.  Additionally, Adkins identified Lopez-Alvarado's birth certificate.  Adkins testified that he searched USCIS's databases, which did not show that Lopez-Alvarado was ever a citizen or naturalized, and, if he had applied for naturalization and been naturalized, the

---

[1] On cross-examination, Adkins testified that USCIS previously was known as the Immigration and Naturalization Service ("INS").

[2] An "A-file" is comprised of a whole immigration record, including an alien's application, enforcement documents, and anything else related to or affecting that alien's immigration status.

databases would have had a document reflecting such.  On cross-examination, Adkins testified that in 1995, a person applied for naturalization, afterwards they were interviewed, and, after the interview, the application was approved, denied, or "continued."  Adkins also testified, in part, that applicants did not take the allegiance oath at the naturalization interview, rather only signed a document acknowledging they understood it and, if approved to proceed to the swearing in, an applicant received a letter telling them where and when to appear to take the oath.

After the government rested its case-in-chief, Lopez-Alvarado moved for a judgment of acquittal, arguing that the government had failed to show he was an alien; the district court denied the motion.  When the district court began discussing the proposed jury instruction for Lopez-Alvarado's defense, Lopez-Alvarado objected to putting any burden of proof for the defense on him; however, he agreed with the court that he had advanced an affirmative defense.

In his defense, Lopez-Alvarado called Ana Pardo, an Immigration and Naturalization Service ("INS") official from the Orlando office in 1995-96.  She testified that in the building that INS used at the time, if they conducted naturalization ceremonies, they used the INS's judge's chambers.  She stated that they filled out a processing worksheet as the case was worked on and identified Lopez-Alvarado's 1995 application and processing form.  She said that, at the

6

interview, the processing sheet would be filled out with information like sex and marriage status; the "C" in the action line of the processing sheet meant she continued the case and she would have filled that out at the time of his interview on December 6, 1995. She testified that an allegiance oath was not administered during the interview, but they would give people an oath to tell the truth in their application. The date of the final action in his case was March 12, 1996, and it was her signature on the sheet; however, she did not have any independent recollection of the events with Lopez-Alvarado, including denying his application. She also testified that except for possibly military members going overseas on orders, ceremonies did not occur right after the interview; she did not remember any ceremonies taking place the same day as an interview, nor did she give the allegiance oath. Pardo also described what a swearing-in ceremony conducted by INS looked like, specifically that groups of 50 up to 1,000 would be brought in, there would be guest speakers, often family and friends would attend, the oath would be given, and the naturalization certificates were handed out at the end of the ceremony.

Lopez-Alvarado took the stand. He admitted that he was a convicted felon. As to his 1995 application, he testified that the first time he met with an INS official was in February 1995; at that time, Pardo questioned him under oath and afterwards asked where he wanted to take his citizenship oath. He was told to

7

come back in December 1995 to take his oath.  He said when he arrived, several officers and Pardo were present; on cross-examination, he said "many people" were at the ceremony, but they were INS officers and, if others were there to take the oath, he did not know because he took the oath quickly and left.  He said that after the oath was administered, officials marked where he should sign that he had taken the oath; on cross-examination, he stated that the oath he signed was the one on his A-file processing sheet.  He also said that they did not give him a certificate on that date; he was told he would get a notice about picking it up, but he never picked it up for various reasons.

After the defense rested, it renewed its motion for judgment of acquittal based on the government's failure to make out a *prima facie* case.  The district court denied the motion.  It also explicitly found that Lopez-Alvarado had committed perjury, stating "I do not find Mr. Alvarado's testimony to be credible. In fact, I find that he's perjured himself."

At the charge conference, the court stated that it wanted to make it clear to the jury that the government did not have to disprove that the naturalization ceremony took place, it only had to prove the elements of the offense; to "avoid confusion," it wanted to add that Lopez-Alvarado had the burden to prove his affirmative defense.  Lopez-Alvarado objected to having the burden; however, he agreed that, if he did, it was by a preponderance of the evidence.  The court

8

ultimately instructed the jury that: "The Defendant has the burden of proving by a preponderance of the evidence that he attended a public naturalization ceremony before March 17, 2018, and took the oath of allegiance at that ceremony." The instructions required the government to prove his alien status beyond a reasonable doubt.

The jury found Lopez-Alvarado guilty of Count 1; the district court entered a verdict to this effect in August 2018. Before scheduling a sentencing hearing in *Lopez-Alvarado II*, the probation office petitioned to revoke Lopez-Alvarado's supervised release in *Lopez-Alvarado I*. Lopez-Alvarado admitted that he had violated his conditions of release based on his recent conviction for illegal re-entry after deportation and for violating the law while on supervised release by failing to register under SORNA.

Shortly thereafter, Lopez-Alvarado indicated that he wanted to withdraw his guilty plea to Count 2 in *Lopez-Alvarado II*, and his admission to violating his supervised release in *Lopez-Alvarado I*; this prompted defense counsel to move to withdraw. A magistrate judge granted the motion to withdraw and appointed new counsel, who moved to stay further proceedings in both cases until the Supreme Court decided *United States v. Gundy*, 695 Fed. App'x 639 (2d Cir. 2017), *cert. granted*, 138 S. Ct. 1261 (2018), a case challenging SORNA's constitutionality based on the non-delegation doctrine.

9

In the meantime, Lopez-Alvarado formally moved to withdraw his Count 2 guilty plea, under Federal Rule of Criminal Procedure 11(d)(2)(B).  The district court denied the motion, noting that he was convicted on May 11, 1998, of committing a lewd act upon a minor, he was required to register under SORNA, and he failed to do so when he returned to Florida.  Lopez-Alvarado also sought to withdraw his admission to violating his supervised release in *Lopez-Alvarado I*.  The court denied that motion as well.

The district court held a sentencing proceeding and a final revocation hearing on the same day.  Based on a total offense level of 26 and a criminal history category of IV, the court calculated Lopez-Alvarado's guidelines range as 92 to 115 months of imprisonment.  The district court found that, from his first deportation through his current trial testimony, Lopez-Alvarado had shown "a complete and utter disregard for the law," and it was "not at all convinced that [he was] mistaken in whether [he was] legally here, and the jury rejected that flatly"; the court believed he would "continue to return and continue to violate the laws of this country, if permitted to do so, and that is simply not acceptable."  It found the guidelines insufficiently captured his risk to society and disregard for the law, and it varied upward before sentencing him to 168 months as to Count 1 and 120 months as to Count 2, set to run concurrently.  It imposed a five-year term of supervised release, with three years for Count 1 and five years for Count 2, again

10

served concurrently.  Lopez-Alvarado's counsel stated that "other than those previously stated in this case, we don't object."  For violating his terms of supervised release, the district court announced that it was revoking his supervised release and sentenced him to 12 months of imprisonment, concurrent to his total sentence in *Lopez-Alvarado II*.

## II.

## A.

On appeal, Lopez-Alvarado argues that SORNA constitutes an unconstitutional delegation of Congress's power; consequently, he should have been permitted to withdraw his guilty plea to the SORNA charge and his admission to violating supervised release upon his violation of SORNA.  We review issues of constitutional law *de novo*.  *United States v. Ambert*, 561 F.3d 1202, 1205 (11th Cir. 2009).  We will disturb the district court's decision to deny a defendant's motion to withdraw a guilty plea only upon an abuse of discretion.  *United States v. McCarty*, 99 F.3d 383, 385 (11th Cir. 1996).  We review a district court's conclusion that a defendant violated terms of his supervised release for an abuse of discretion.  *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994).  Issues which a party does not "devote a discrete section of his argument to" are deemed abandoned.  *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

11

In *Ambert*, we concluded that Congress "provided the Attorney General with 'intelligible principles' in" SORNA, "a policy framework" guiding the Attorney General's exercise of discretion, and "constrict[ed] the Attorney General's discretion to a narrow and defined category." 561 F.3d at 1213. We rejected Ambert's argument that SORNA violated the non-delegation doctrine because the Attorney General determined its retroactive applicability. *See id.* at 1212-15.

In *Gundy v. United States*, the Supreme Court considered whether SORNA's delegation, to the Attorney General, of the power to specify its applicability to those convicted pre-SORNA violated the non-delegation doctrine. *See Gundy v. United States*, 139 S. Ct. 2116, 2122 (2019). The Supreme Court held that this delegation did not violate the non-delegation doctrine. *See id.* at 2121. Four Justices joined the opinion and Justice Alito concurred in the judgment. *See id.* at 2121, 2130-31. In his concurrence though, Justice Alito indicated that, if a majority of the Court wished to do so, he supported reconsidering the Court's decades' long approach to the non-delegation doctrine; however, he concurred with the judgment in *Gundy* "because a majority is not willing to do" so. *See id.* at 2130-31 (Alito, J., concurring). Justice Gorsuch, writing for the dissent,

12

concluded that SORNA violated the non-delegation doctrine.[3] *See id.* at 2131-48 (Gorsuch, J., dissenting).

This Court is bound by "a prior panel's holding unless and until it is overruled or undermined to the point of abrogation by an opinion of the Supreme Court or of this Court sitting en banc." *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019). This "rule applies regardless of whether the later panel believes the prior panel's opinion to be correct . . . ." *Id.*

Lopez-Alvarado has abandoned any argument aside from SORNA's constitutionality by not arguing it on appeal. *See Jernigan*, 341 F.3d at 1283 n.8. Further, irrespective of the weight of authority *Gundy* should be given, Lopez-Alvarado's argument on this issue fails because our binding precedent remains unaffected by *Gundy* and forecloses his argument that SORNA violates the non-delegation doctrine. *See Gillis*, 938 F.3d at 1198; *Ambert*, 561 F.3d at 1212-15.

## B.

Lopez-Alvarado argues that the district court erred in concluding that whether he was a naturalized citizen and, by implication, the legality of his prior deportations were factual questions for the jury to decide, rather than legal issues

---

[3] In November 2019, although concurring with the denial of *certiorari* in *Paul v. United States*, 140 S. Ct. 342 (2019), which "raise[d] the same statutory interpretation issue" in *Gundy*, Justice Kavanaugh wrote that Justice Gorsuch's opinion "may warrant further consideration in future cases."

for the district court to decide.  "[I]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party."  *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir. 2005) (quoting *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997)).  This doctrine "is implicated when a party induces or invites the district court into making an error," and "precludes a court from invoking the plain error rule and reversing."  *Id.* (first quoting *United States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998); and then quoting *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1294 (11th Cir. 2002)).

When the doctrine is not applicable, un-objected to errors will be reviewed under the "extremely high" plain error standard, requiring: (1) an error; (2) that is plain or obvious; (3) which "affect[s] substantial rights in that it was prejudicial and not harmless; and (4) the mistake [] seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings."  *Id.* at 1337 n.17.  Plain errors must be "obvious" and "clear under current law."  *See United States v. Lange*, 862 F.3d 1290, 1296 (11th Cir. 2017) (quoting *United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999)).  "[T]here can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."  *Id.* (quoting *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003)).

14

In a prosecution for illegal re-entry after deportation, under 8 U.S.C. § 1326(a) and (b)(2), the government must prove four elements: (1) the defendant was an alien when he committed the offense; (2) he previously had been deported or removed; (3) he re-entered the United States after deportation; and (4) he lacked the Attorney General's express consent. *See United States v. Valdiviez-Garza*, 669 F.3d 1199, 1201 (11th Cir. 2012).

Section 1326 does not require, as an element, an alien's previous deportation be lawful, but an alien may collaterally attack the deportation under certain circumstances. *See United States v. Holland*, 876 F.2d 1533, 1535-36 (11th Cir. 1989). Section 1326(d) limits an alien's ability to collaterally attack an underlying deportation order unless the alien meets three requirements: (1) he exhausted any available administrative remedies to seek relief from the order; (2) the deportation proceedings imposing the order deprived him "of the opportunity for judicial review"; and (3) the order's entry "was fundamentally unfair." 8 U.S.C. § 1326(d). Aliens have raised this collateral attack in motions to dismiss. *See United States v. Watkins*, 880 F.3d 1221, 1223-24 (11th Cir. 2018); *Zelaya v. Sec., Fla. Dep't of Corr.*, 798 F.3d 1360, 1363 (11th Cir. 2015), *overruled in part on other grounds by McCarthan v. Dir. of Goodwill Industries-Suncoast, Inc.*, 851 F.3d 1076 (11th Cir. 2017) (en banc). In a § 1326 prosecution, a citizenship defense to the alien element does not necessarily challenge the other elements of the offense, including

15

deportation, or the legality of the deportation. *See Valdiviez-Garza*, 669 F.3d at 1201-03 (holding the government was collaterally estopped from proving the defendant was an alien in a § 1326 prosecution where, in a prior § 1326 prosecution, the defendant contested the alienage element "with evidence that he derived United States citizenship through his father," the principal focus of the prior trial was the citizenship element, and alienage was necessarily determined in his favor).

The Supreme Court has held that the Illegal Immigration and Reform and Immigrant Responsibility Act of 1996's repeal of discretionary relief for aliens convicted of certain crimes did not apply retroactively where the "convictions were obtained through plea agreements and [for aliens] who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *See INS v. St. Cyr.*, 533 U.S. 289, 326 (2001).

To the extent any error occurred by the district court permitting Lopez-Alvarado to present to the jury his defense that he took the oath of allegiance at a public ceremony, he invited such error by arguing before the district court for the ability to submit this defense to the jury and cannot now complain of such error. *Silvestri*, 409 F.3d at 1327. Prior to witnesses testifying, Lopez-Alvarado agreed that his defense was a factual issue and should go to the jury. Nevertheless, even considering the merits of his argument, the district court did not err in permitting

16

the jury to decide the question of his alien status.  At trial, Lopez-Alvarado presented the defense that he took the oath of allegiance at a public ceremony and became a naturalized citizen.  This defense does not inherently challenge the legality of his prior deportations, which also requires specific proof his defense did not provide, and a citizenship defense does appear to be a fact for a jury to decide. *See* 8 U.S.C. § 1326(d); *Valdiviez-Garza*, 669 F.3d at 1201-03.

## C.

Lopez-Alvarado argues that his citizenship defense was not an affirmative defense, and the district court erred in shifting the burden of proof from the government to him on this issue, violating his due process rights.  "We review the legal correctness of a jury instruction de novo, but defer on questions of phrasing absent an abuse of discretion."  *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (citations omitted).  Harmless error also applies to jury instructions.  *United States v. Webb*, 655 F.3d 1238, 1249 n.8 (11th Cir. 2011).  We have applied harmless error analysis to jury instructions which improperly shifted the burden of proof on an element to the defendant.  *See Davis v. Kemp*, 752 F.2d 1515, 1519-21 (11th Cir. 1985) (en banc) (applying harmless error analysis to jury instruction shifting homicide malice burden of proof to defendant).  An error can be harmless if the evidence of the defendant's guilt was overwhelming, such "that no rational jury, properly instructed on [that] element" could have acquitted the

17

defendant.  *See United States v. Neder*, 197 F.3d 1122, 1129 & n.7 (11th Cir. 1999) ("[H]armless-error analysis requires us to focus on whether a jury rationally could have reached a different verdict if properly instructed . . . ."); *Kemp*, 752 F.2d at 1521.

The Due Process Clause requires the prosecution prove every element of the offense beyond a reasonable doubt and "[t]he burden to prove or disprove an element of the offense may not be shifted to the defendant." *United States v. Deleveaux*, 205 F.3d 1292, 1298 (11th Cir. 2000).  Thus, where a defense merely "has the effect of negating any element of the offense, the prosecution must disprove that defense beyond a reasonable doubt." *Id.*  But, if "a defendant asserts an affirmative defense that does not negate any element of the offense, the defendant may be required to prove that defense by a preponderance of the evidence." *Id.* at 1298-99.

As an initial matter, this issue only addresses Lopez-Alvarado's illegal re-entry offense, because that is the sole count he went to trial on.  Further, his defense arguably negated an element of the offense, specifically his alien status. *See Valdiviez-Garza*, 669 F.3d at 1201.  As the government correctly concedes that the jury instruction impermissibly shifted the burden of proof to him, we proceed directly to harmless error analysis.

18

Assuming error occurred, we conclude that Lopez-Alvarado is not entitled to relief because any error was harmless, given that the government presented overwhelming evidence of his alien status at trial. While Lopez-Alvarado testified that he indeed attended such ceremony and took the oath, the documentary evidence in his A-file and the testimony of Adkins and Pardo showed that this did not occur. Adkins testified that USCIS's databases did not show Lopez-Alvarado ever became a naturalized citizen and identified his Mexican birth certificate. Both Adkins and Pardo testified that applicants do not take the oath at their interview, but merely sign the acknowledgement. Pardo testified that, at the interview, Lopez-Alvarado's application was "continued," not approved, and she had requested documents about his arrests. Both Pardo and Adkins testified to naturalization ceremony process; Pardo described their size, and Adkins stated that the ceremonies gathered multiple applicants, who sat and took the oath together, the applicants received their citizen certificate that day, and that a certain form was utilized for the ceremonies, which was not in Lopez-Alvarado's A-file. Finally, the jury, by convicting Lopez-Alvarado, implicitly deemed him incredible, and may have taken the opposite of what he testified to as true, which it was entitled to do. *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (quoting *Atkins v. Singletary*, 965 F.2d 952, 961 n.7 (11th Cir. 1992)) (noting that, by choosing to

19

testify, the defendant "runs the risk that if disbelieved 'the jury might conclude the opposite of his testimony is true'").

Because overwhelming evidence arguably showed that Lopez-Alvarado was an alien, the district court's error in improperly shifting the burden to him was harmless,[4] *see Neder*, 197 F.3d at 1129, 1129 n.7.

## D.

Finally, Lopez-Alvarado argues that the district court erred during his sentencing by imposing an obstruction of justice enhancement and that his 168-month total sentence is substantively unreasonable. We review a district court's interpretation and application of the Guidelines to the facts *de novo*. *United States v. Moran*, 778 F.3d 942, 959 (11th Cir. 2015). However, factual findings the district court made at sentencing are reviewed only for clear error. *Id.* We have also said that, in most cases, we apply due deference when reviewing the district court's application of the guidelines to the facts, which is akin to clear error review. *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010). A factual finding cannot be clearly erroneous when the factfinder chooses between "two permissible views of the evidence." *United States v. Saingerard*, 621 F.3d 1341, 1343 (11th Cir. 2010) (quoting *United States v. Izquierdo*, 448 F.3d 1269,

---

[4] We take note of the fact that the district court also included in its instructions that the government had the burden of proving beyond a reasonable doubt that Lopez-Alvarado was an alien.

20

1278 (11th Cir. 2006)).  We also give a district court's credibility determinations made at sentencing "substantial deference."  *United States v. Plasencia*, 886 F.3d 1336, 1343 (11th Cir. 2018) (quoting *United States v. Clay*, 483 F.3d 739, 744 (11th Cir. 2007)), *cert. denied*, 139 S. Ct. 837 (2019).

We review a sentence's reasonableness "under a deferential abuse-of-discretion standard."  *Gall v. United States*, 552 U.S. 38, 41 (2007).  A court abuses its discretion when it (1) fails to consider relevant factors that were due significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) commits a clear error of judgment by balancing the proper factors unreasonably.  *United States v. Kuhlman*, 711 F.3d 1321, 1326-27 (11th Cir. 2013).  We reverse only when "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the [18 U.S.C.] § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (quoting *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008)).

Sentencing Guidelines § 3C1.1 enhances an individual's offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to [] the

21

defendant's offense of conviction and any relevant conduct . . . ." U.S.S.G. § 3C1.1. Commentary notes explain that it is not meant to punish any defendant for exercising his constitutional right or denying guilt, unless he does so under oath and commits perjury, and "court[s] should be cognizant that inaccurate testimony . . . sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony . . . necessarily reflect[s] a willful attempt to obstruct justice." *Id.* cmt. n.2. This adjustment applies to perjury. *Id.* cmt. n.4.

Perjury, under this enhancement, is "giving 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Plasencia*, 886 F.3d at 1346 (quoting *United States v. Bradberry*, 466 F.3d 1249, 1254 (11th Cir. 2006)). Material evidence is that, which "if believed, would tend to influence or affect the issue under determination." *Id.* (quoting U.S.S.G. § 3C1.1 cmt. n.6). District courts should include specific findings of "each alleged instance of obstruction by identifying the materially false statements individually," but generally finding the enhancement applies is sufficient "if it encompasses all of the factual predicates necessary for a perjury finding." *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002) (quoting *United States v. Arguedas*, 86 F.3d 1054, 1059 (11th Cir. 1996); and then quoting *United States v. Lewis*, 115 F.3d 1531, 1538 (11th Cir. 1997)).

For a district court to find a defendant perjured himself four elements are required: (1) testimony under oath; (2) which was false; (3) the testimony was material; and (4) the testimony was "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." *Id.* at 763 n.4. "With only a cold, paper record before it an appellate court is severely hindered in evaluating whether a defendant perjured himself at trial." *United States v. McDonald*, 935 F.2d 1212, 1219 (11th Cir. 1991). By contrast, a trial "court is uniquely situated to make such a determination because it heard all the evidence and was able to observe a particular witness' demeanor and behavior on the witness stand." *See id.*

In deciding the substantive reasonableness of a sentence, we look at the totality of the circumstances to decide whether the sentence achieves § 3553(a)'s stated purposes. *United States v. Sarras*, 575 F.3d 1191, 1219 (11th Cir. 2009). Substantively unreasonable sentences include those where the district court relied on any single § 3553(a) factor unjustifiably, did not consider relevant § 3553(a) factors, or arbitrarily selected a sentence. *See id.* The party challenging a sentence must show it is unreasonable in light of the § 3553(a) factors and the record. *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010). District courts must impose sentences sufficient, but not greater than necessary, to comply with § 3553(a)(2)'s purposes, including-the need to adequately deter criminal conduct,

23

protect the public from further crimes by the defendant, and "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"-as well as consider the other § 3553(a) factors, including, *inter alia*, the offense's nature and circumstances and defendant's history and characteristics.  18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).  The weight given to each § 3553(a) factor is within the district court's sound discretion.  *Kuhlman*, 711 F.3d at 1327.  When considering the § 3553(a) factors, district courts may also consider previous criminal conduct encompassed by an enhancement.  *United States v. Turner*, 626 F.3d 566, 574 (11th Cir. 2010).

We do not presume that a sentence outside the guideline range is unreasonable, but we will consider the extent of any variance and give "due deference" to assess whether the § 3553(a) factors justified the variance's extent.  *Id.* at 573-74 (quoting *Gall*, 552 U.S. at 51).  District courts have to seriously consider the extent of a variance and explain its propriety "in a particular case with sufficient justifications."  *See Gall*, 552 U.S. at 46.  The court's justifications "must be 'compelling' enough 'to support the degree of the variance' and complete enough to allow meaningful appellate review," but "an extraordinary justification" is not required for a sentence outside the guideline range.  *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (quoting *Gall*, 552 U.S. at 50).  A sentence

24

imposed well below the statutory maximum penalty also indicates a reasonable sentence.  *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

Here, as to the enhancement, the district court adequately addressed its perjury finding at sentencing, showing that each of the four elements were fulfilled for a generalized perjury finding.  *See Singh*, 291 F.3d at 763 & n.4.  Lopez-Alvarado falsely testified under oath about the naturalization ceremony and oath, which was material because it went to the contested issue of whether he was an alien; the district court found his testimony was intentional, willful, and not a product of confusion via cross-examination.  *See Plasencia*, 886 F.3d at 1346.  In light of our deference to credibility determinations at sentencing, the district court's decision to credit other witnesses' testimony and apply the enhancement was not clearly erroneous.

Additionally, the district court also did not abuse its discretion by imposing the 53-month upward variance.  That the 168-month total sentence remained far below the 240-month statutory maximum on Count 1 indicates its reasonableness.  *See Gonzalez*, 550 F.3d at 1324.  Further, the three reasons the district court identified for varying upwards—his "complete disregard for the laws" of the country, continued violation of "the law after serving lengthy prior sentences," and the need to protect the public—were all supported by evidence the district court heard at sentencing and made clear by the district court during the hearing.  That

25

some of the district court's reasons may have also been encompassed in his guideline range calculation did not prevent the court from considering them again in a variance and it was permitted to give greater weight to certain factors. *See Kuhlman*, 711 F.3d at 1327; *Turner*, 626 F.3d at 574.

**AFFIRMED.**